**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DALE THEIS, individually and on behalf of all others similarly situated,

*Plaintiff*,

*v.*

AVG TECHNOLOGIES USA, INC., a Delaware corporation, AVG TECHNOLOGIES CZ, S.R.O., a Czech company, and AUSLOGICS SOFTWARE PTY LTD., an Australian company,

*Defendants*.

Civil Action No: 12-cv-10920

**Leave to File Granted on October 31, 2012**

**PLAINTIFF'S OPPOSITION TO THE AVG DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT**

JAY EDELSON (*Pro Hac Vice*)
jedelson@edelson.com
RAFEY S. BALABANIAN (*Pro Hac Vice*)
rbalabanian@edelson.com
BENJAMIN H. RICHMAN (*Pro Hac Vice*)
brichman@edelson.com
CHANDLER R. GIVENS (*Pro Hac Vice*)
cgivens@edelson.com
EDELSON MCGUIRE LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370

DAVID PASTOR (BBO# 391000)
dpastor@pastorlawoffice.com
PASTOR LAW OFFICE, LLP
63 Atlantic Avenue, Third Floor
Boston, Massachusetts 02110
Tel: 617.742.9700

*Counsel for Plaintiff Dale Theis*

# TABLE OF CONTENTS


I. **INTRODUCTION** .......... 1

II. **FACTUAL AND PROCEDURAL BACKGROUND** .......... 5

A. **AVG US and AVG CZ Work Together to Sell and Promote Products Under the AVG Brand, Including their PC Tuneup Software** .......... 5

B. **The AVG Defendants Misrepresent PC Tuneup's Functionality Through their Websites, Marketing Materials, and In-Software Statements** .......... 7

C. **Theis Relied On The AVG Defendants' Fraudulent Misrepresentations and Purchased the Full Version of the PC Tuneup Software** .......... 8

D. **Plaintiff's Expert Exposes PC Tuneup's Deceptive Design and Marketing** .......... 8

E. **The Same Fraudulent Methods Are Used Throughout the Utility Software Industry** .......... 9

III. **ARGUMENT** .......... 10

A. **As An Initial Matter, Plaintiff Has Pleaded A Concrete and Particularized Injury Sufficient To Confer Standing** .......... 11

B. **Massachusetts Law Is Controlling: Neither The AVG End User License Agreement, Nor Its Choice of Law Provision, May Be Considered and Choice Of Law Principles Require Its Application** .......... 15

1. *The End User License Agreement (EULA) cannot be considered because it has not been incorporated by reference* .......... 16

2. *Given that the EULA does not apply, Massachusetts choice of law principles require that Massachusetts law, rather than the laws of any other jurisdiction, be applied to Plaintiff's claims* .......... 17

C. **Theis Alleges Sufficient Facts to Support A Finding That AVG US Was Directly Involved in the Conduct at Issue** .......... 21

1. *Plaintiff sufficiently alleges that AVG US was directly involved in the fraudulent design and marketing of the PC TuneUp software* .......... 21

2. *AVG US and AVG CZ are one and the same entity* .......... 22

**D. Plaintiff Satisfies Rule 9(b)'S Heightened Pleading Standard For His Fraudulent Inducement Claim** ............ 25

**E. The Representations Found in Defendants' Advertising Materials in Their Software, and on Their Website Form the Express Warranties That They Ultimately Breached** ............ 27

*1. The PC Tuneup software is a "good" under the UCC* ............ 27

*2. Even if the Court considers the EULA, its disclaimer is at odds with Defendants' express representations and thus, is inoperative* ............ 29

*3. Defendants cannot disclaim the implied warranty of merchantability either.* ............ 31

*4. Plaintiff's contract-based claims clearly identify the terms of the contract and Defendants' breach* ............ 33

a. Plaintiff adequately pleads all of the elements of his claim for breach of contract ............ 33

b. Plaintiff also adequately alleges Defendants' breach of the implied covenant of good faith and fair dealing ............ 34

**F. Plaintiff's Claim for Unjust Enrichment is Properly Pled In the Alternative to His Contract-Based Claims** ............ 35

**IV. CONCLUSION** ............ 36

## TABLE OF AUTHORITIES

**United States Supreme Court Cases:**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007) .......... 10

*Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) .......... 17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......... 11-12

*Mass. v. E.P.A.*, 549 U.S 497 (2007) .......... 11

*Sierra Club v. Morton*, 405 U.S. 727 (1972) .......... 12

*Whitmore v. Ark.*, 495 U.S. 149 (1990) .......... 11

**United States Circuit Court of Appeals Cases:**

*Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670 (3d Cir. 1991) .......... 28

*Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12 (1st Cir. 1998) .......... 16

*Cigna Ins. Co. v. Oy Saunatec, Ltd.*, 241 F.3d 1 (1st Cir. 2001) .......... 19-20, 31-32

*Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115 (1st Cir. 1995) .......... 33

*Cox v. Mortgage Elec. Registration Sys., Inc.*, 685 F.3d 663 (8th Cir. 2012) .......... 35

*Doyle v. Hasbro, Inc.*, 103 F.3d 186 (1st Cir. 1996) .......... 25

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 412 F.3d 215 (1st Cir. 2005) .......... 35

*Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012) .......... 14

*McAdams v. Massachusetts Mut. Life Ins. Co.*, 391 F.3d 287 (1st Cir. 2004) .......... 34

*Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649 (7th Cir. 1998) .......... 28

*Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10 (1st Cir. 1985) .......... 23

*Pujol v. Shearson/American Express, Inc.*, 829 F.2d 1201 (1st Cir.1987) .......... 10

*RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543 (9th Cir. 1985) .......... 28

*Russell v. Salve Regina College*, 890 F.2d 484 (1st Cir. 1989) ....................................................29

*Stoebner v. Lingenfelter*, 115 F.3d 576 (8th Cir. 1997)..............................................................25

*Team Nursing Servs., Inc. v. Evangelical Lutheran Good Samaritan Soc'y,*
433 F.3d 637 (8th Cir. 2006) ........................................................................................35

*Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315 (1st Cir. 2008) ...........................16

*United Elec., Radio & Mach. Workers of America v. 163 Pleasant Street Corp.*,
960 F.2d 1080 (1st Cir. 1992)........................................................................................23

*Watterson v. Page*, 987 F.2d 1 (1st Cir. 1993) .................................................................16

*Zimmerman v. Puccio*, 613 F.3d 60 (1st Cir. 2010)............................................................. 22-23

**<u>United States District Court Cases</u>:**

*Aliberti v. GMAC Mortgage, LLC*, 779 F. Supp. 2d 242 (D. Mass. 2011)..................................26

*Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425 (S.D.N.Y. 1996)............................28

*Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118 (D. Mass. 2011) ................................17, 33

*Blair v. Infineon Technologies AG*, 720 F. Supp. 2d 462 (D. Del. 2010).....................................25

*Commonwealth Aluminum Corp. v. Baldwin Corp.*,
980 F. Supp. 598 (D. Mass. 1997) ..................................................................................23

*Dahlmann v. Sulcus Hospitality Technologies, Corp.*,
63 F. Supp. 2d 772 (E.D. Mich. 1999)...........................................................................28

*Daynard v. MRRM, P.A.*, 335 F. Supp. 2d 156 (D. Mass. 2004)...................................................20

*Eldridge v. Gordon Bros. Group, LLC*,
No. CIV.A. 08-11254-DPW, 2011 WL 3439180 (D. Mass. Aug. 4, 2011) ......................13

*ePresence, Inc. v. Evolve Software, Inc.*, 190 F. Supp. 2d 159 (D. Mass. 2002)...........................28

*Freeman v. Town of Hudson*, 849 F. Supp. 2d 138 (D. Mass. 2012) ...........................................16

*Gross v. Symantec Corp.*,
No. C 12-00154 CRB, 2012 WL 3116158 (N.D. Cal. July 31, 2012)........12-13, 16-17, 28

*Guckenberger v. Boston Univ.*, 974 F. Supp. 106 (D. Mass. 1997)..............................................29

*In re Toyota Motor Corp. Unintended Acceleration Mktgs., Sales Practices, and Prods. Liab. Litig.*, 754 F. Supp. 2d 1145 (C.D. Cal. 2010)......................................14

*Kiah v. Aurora Loan Services, LLC*, No. CIV.A10-40161-FDS, 2011 WL 841282 (D. Mass. Mar. 4, 2011)...........................25

*Kulesa v. PC Cleaner, Inc.*, No. 8:12-cv-00725 (C.D. Cal. 2012) .................................................... 1, 10-11, 14, 17, 28

*Linton v. New York Life Ins. & Annuity Corp.*, 392 F. Supp. 2d 39 (D. Mass. 2005) ..................34

*Newcourt Fin. USA, Inc. v. FT Mortgage Cos.*, 161 F. Supp. 2d 894 (N.D. Ill. 2001) ................28

*Nollet v. Justices of the Trial Court of Mass*., 83 F. Supp. 2d 204, 208 (D. Mass. 2000) .............................................................16

*Parker v. iolo Industries, LLC*, No. CV 12-00984 GAF, 2012 WL 4168837 (C.D. Cal. Aug. 20, 2012)......................1, 14

*Roll Sys., Inc. v. Shupe*, No. CIV. A. 97-12689-GAO, 1998 WL 1785455 (D. Mass. Jan. 22, 1998)....................19

*Rule v. Fort Dodge Animal Hosp., Inc.*, 604 F. Supp. 2d 288 (D. Mass. 2009)...........................32

*Stevens v. Thacker*, 550 F. Supp. 2d 161 (D. Mass. 2008) ..........................................................35

*Stuto v. Corning Glass Works*, No. CIV. A. 88-1150-WF, 1990 WL 105615 (D. Mass. July 23, 1990) ..........................30

*TechTarget, Inc. v. Spark Design, LLC*, 746 F. Supp. 2d 353 (D. Mass. 2010)...........................22

*Wang v. OCZ Tech. Group, Inc.*, 276 F.R.D. 618 (N.D. Cal. 2011)...................................... 13-14

*Watkins v. Omni Life Sci., Inc.*, 692 F. Supp. 2d 170 (D. Mass. 2010) .......................................19

**State Court Cases:**

*Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381 (2004) ..............................................13

*Attorney Gen. v. M.C.K., Inc*., 432 Mass. 546 (2000) .......................................................... 22-23

*Back v. Wickes Corp.*, 375 Mass. 633 (1978) ..................................................................................19

*Berger v. H.P. Hood, Inc.,* 416 Mass. 652 (1993) ............................................................................23

*Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622 (1985) ........................................................17

*Danca v. Taunton Sav. Bank,* 385 Mass. 1 (1982) .................................................................. 25-26

*Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434 (Del. 2005) ..............................................35

*Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole*,
766 N.W.2d 334 (Minn. Ct. App. 2009) ...................................................................25

*Evans v. Multicon Constr. Corp.*, 30 Mass. App. Ct. 728 (1991) .................................................23

*H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129 (Del. Ch. 2003) ...............................................34

*Hannon v. Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813 (1982) ....................................30

*Hanson v. Bradley*, 298 Mass. 371 (1937) .........................................................................22

*Hewitt v. Bay State Gas Co.*, 63 Mass. App. Ct. 1121 (2005) ......................................................23

*Jacobs v. Yamaha Motor Corp., U.S.A.*, 420 Mass. 323 (1995) ....................................................31

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614 (1968) ..................................22

*Olcott Int'l & Co., v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063 (Ind. App. 2003) .................28

*Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443 (2002) ............................................ 25-26

*Salamon v. Terra*, 394 Mass. 857 (1985) .........................................................................35

*Thomas B. Olson & Associates, P.A. v. Leffert, Jay & Polglaze, P.A.*,
756 N.W.2d 907 (Minn. Ct. App. 2008) ...................................................................34

*USM Corp. v. Arthur D. Little Sys., Inc.*, 28 Mass. App. Ct. 108 (1989) ................................ 30-31

*Walsh v. Atamian Motors, Inc.*, 10 Mass. App. Ct. 828 (1980) ....................................................32

**<u>Rules</u>:**

Del. Code tit. 6, § 2-316 ..........................................................................................20, 29

Minn. Stat. § 336.2-316 ..........................................................................................20, 29

**<u>Miscellaneous Authorities</u>:**

G.L. c. 106 (1992 ed.) ........................................................................................... 19, 29-31

Restatement (Second) of Conflict of Laws (1971) .................................................................. 17-19

# I. INTRODUCTION

This case is about Defendants AVG Technologies USA, Inc. ("AVG US"), AVG Technologies CZ, s.r.o. ("AVG CZ") (collectively, "AVG" or "the AVG Defendants"), and Auslogics Software Pty Ltd.'s ("Auslogics")[1] fraudulent design and marketing of their PC Tuneup computer software ("PC Tuneup"). Deriding the amended complaint as supposedly "one of multiple 'cookie cutter' putative class actions that Plaintiff's counsel has brought across the country" (Dkt. 36 at 1), Defendants conveniently fail to point out that the utility software industry is replete with companies employing unfair and deceptive business practices like those complained of here, which are carried out in much the same way by each of them. As such, if Plaintiff's complaint here resembles others filed against Defendants' industry competitors, it's because Defendants employ those very same unfair and deceptive practices as their industry competitors. If Defendants are unhappy with the similarities between the instant complaint and others, then perhaps they should vary the ways in which they defraud their customers.

The irony, of course, is that in attacking Plaintiff's counsel for supposedly filing similar complaints against various actors in the utility software industry, Defendants merely repackage arguments first brought by their industry competitors in those other cases—arguments that, contrary to Defendants' assertions, have been rejected by all but one of the courts in which the cases are pending,[2] save for ordering the plaintiffs to replead certain allegations with heightened

---

1 Auslogics has yet to appear in this matter and therefore, did not participate in the briefing on the issues raised in the AVG Defendants' motions. Rather, Plaintiff is currently in the process of serving Auslogics in Australia in accordance with the terms of the Hague Convention on Service Abroad. Notably, despite the fact that they admittedly (to this day) pay a license fee to Auslogics for the use of the technology underlying the software at issue, the AVG Defendants maintain that they have had no communications with Auslogics regarding this matter and are unable to assist in hastening its appearance.

2 The sole case in which the court rejected the plaintiff's legal theory, finding that she lacked standing because she failed to allege a concrete and particularized injury, *Parker v. iolo Industries, LLC*, No. CV 12-00984 GAF, 2012 WL 4168837, at *3 (C.D. Cal. Aug. 20, 2012), is currently on appeal. Furthermore, subsequent to the ruling in *Parker*, another district court in the very same district, in the case of *Kulesa v. PC Cleaner, Inc*., No. 8:12-cv-00725, Dkt. No. 49, at 7 (C.D. Cal. Aug. 17, 2012) (a true and accurate copy of the *Kulesa* Court's opinion is

particularity. Thus, while Defendants attempt to characterize those cases as failing to survive any motion to dismiss, the reality is that the courts presiding over those cases have largely accepted the plaintiffs' legal theories—similar to those alleged here—and several of those cases have resulted in multi-million dollar class action settlements.[3] Defendants' citation to those other cases is nothing more than an attempt to divert attention from their own fraudulent behavior.

Through their marketing materials—found on the AVG website, across the Internet and in the software itself—Defendants misrepresent the functionality of PC Tuneup and, ultimately, trick consumers into purchasing the full version of the software. Defendants' method of operation is as follows: A consumer searching the Internet or in stores for software to enhance the speed and performance of his or her computer or cure any number of defects, will encounter Defendants' advertising materials promising to do just that. Online, Defendants begin by offering a "free scan" that purports to provide a preliminary assessment of the health and security of the consumer's computer, which invariably overstates and exaggerates the existence of errors and security risks to the system. The sum total of these (mis)representations is that consumers

---

attached as Exhibit 1), rejected the court's holding in *Parker*, finding that "Plaintiff's claim that she overpaid for a [software] product that did not work as advertised and thus was deprived of the benefit of the bargain suffices to establish standing."

[3] The settlements reached with Defendants' industry competitors are in the following cases: (i) *Drymon, et al. v. Cyberdefender Corp*., No. 11 CH 16779 (Cir. Ct. Cook County, Ill.) (Hon. K. Pantle, presiding) (Creating $9.75 million settlement fund from which class members could make a claim for $10 for each software product purchase; prospective relief requiring Defendant to provide consumers with enhanced disclosures regarding the functionality and methodology of the software products at issue, as well as certain changes to the software itself; settlement finally approved on Sept. 13, 2011); (ii) *Webb, et al. v. cleverbridge, Inc., et al*., No. 1:11-cv-04141 (N.D. Ill.) (Creating $4 million settlement fund from which class members could make a claim for $8 for each software product purchase; prospective relief requiring Defendants to provide consumers with enhanced disclosures regarding the functionality and methodology of the software products at issue; settlement preliminarily approved on July 12, 2012 and awaiting final approval); (iii) *LaGarde v. Support.com, Inc.*, No. 3:12-cv-00609-JSC (N.D. Cal.) (Creating $8.5 million settlement fund from which class members could make a claim for $10 for each software product purchased; three (3) free months of Support.com's anti-spyware software; and prospective relief requiring Defendant to provide consumers with enhanced disclosures regarding the functionality and methodology of the software products at issue, as well as certain changes to the software itself; settlement awaiting preliminary approval); and (iv) *Ledet v. Ascentive, LLC*, No. 2:11-CV-294-PBT (E.D. Penn.) (Creating $9.6 million settlement fund from which class members could make a claim for a collective amount of $18; prospective relief requiring Defendant to provide consumers with enhanced disclosures regarding the functionality and methodology of the software products at issue, as well as certain changes to the software itself; settlement preliminarily approved on August 29, 2012 and awaiting final approval). Several other cases are in settlement discussions and/or mediation.

reasonably believe that their computers are at risk or otherwise in need of repair and thus, that they must purchase the full version of the software to address the purported issues.

In the end, neither the free scan nor the full version of PC Tuneup performs as advertised (i.e., accurately detecting, identifying and removing harmful errors, protecting users' privacy, improving a computer's efficiency and performance, and increasing its overall stability). Instead, Defendants intentionally designed the software to exaggerate the health and security risks to any computer, no matter what. As a result, Plaintiff Dale Theis and the putative class he seeks to represent have all been damaged by Defendants' conduct in that they were all tricked into paying for software that doesn't perform the beneficial tasks that Defendants said it does, and thus, isn't worth what they paid.

AVG US and AVG CZ now each separately[4] seek dismissal of Plaintiff's First Amended Complaint ("FAC") on several grounds: (1) Plaintiff purportedly fails to allege a concrete and particularized injury sufficient to confer standing; (2) that the UCC does not apply to the software at issue in this case, because it's supposedly not a "good"; (3) that Plaintiff fails to plead his fraud-based claims with the particularity required by Rule 9(b); and (4) that the terms of the AVG Defendants' End User License Agreement ("EULA") bar Plaintiff's contract-based claims. For its part, AVG US argues further that it was not privy to the fraudulent conduct in question, and that if anyone is to blame it is its sister company, AVG CZ (conveniently located in the Czech Republic). And, finally, Defendants—despite themselves vacillating between the laws of Delaware, Massachusetts, and Minnesota—fault Plaintiff for claiming that Massachusetts law applies.

None of Defendants' arguments carry the day. First, Defendants' claim that Plaintiff fails

---

[4] The AVG Defendants each filed a separate motion to dismiss the FAC. (*See* Dkt. Nos. 35-37.) However, because of the significant overlap between the arguments raised in each motion and for the sake of efficiency, Plaintiff submits this joint response to the two motions.

to allege a concrete and particularized injury and therefore lacks standing simply ignores the plain allegations in the FAC. Theis expressly pleads that he viewed Defendants' representations about its PC Tuneup software, followed Defendants' directions to download a free trial version of the software and run a free scan, and relied to his detriment on the exaggerated and ultimately false feedback he received from the software by purchasing a full version of PC Tunuep—a product that was not worth what he paid because it did not and could not perform as advertised—and was thus harmed by being denied the full benefit of the bargain. Further, Defendants' argument that their PC Tuneup is not a "good" runs counter to the authority on the issue. Courts throughout the country have consistently held that consumer software products like the PC Tuneup software here are considered "goods" within the meaning of the U.C.C. Finally, despite what Defendants say, Plaintiff has detailed the who, what, where, when and how of Defendants' false statements, in full satisfaction of Rule 9(b)'s heightened pleading standard. Thus, Plaintiff has sufficiently pled his claims and has gone above and beyond the requisite specificity and particularity required at this stage of the proceedings.

Defendants' disclaimer and choice-of-law arguments also fail. As an initial matter, it would be inappropriate for the Court to take judicial notice of or consider the EULA as part of Defendants' motions to dismiss because Plaintiff does not reference, incorporate, or rely upon the EULA in his FAC. Accordingly, Defendants' heavy reliance on the EULA (and its choice-of-law provision) is misplaced, and the Court should properly analyze Plaintiff's claims under Massachusetts law. Further, Defendants cannot disclaim the explicit representations they have made about the software's supposed functionality on their website and within the software, which provide the basis for the bargain between the Parties, nor can they disclaim the implied warranty of merchantability under Massachusetts law. But, even if the Court were to take the

EULA into consideration, the same results hold true under Delaware and Minnesota law (except Plaintiff's claim for breach of the implied warranty, which can be properly disclaimed). Accordingly, Plaintiff has more than adequately pled the existence of a contract, the agreement's express and implied terms and warranties, Plaintiff's reliance, and Defendants' breach. As such, Plaintiff's claims for breach of contract, breach of express warranties, breach of the implied warranty of merchantability, and breach of the implied covenant of good faith and fair dealing should stand as well.

For these reasons and as explained further below, the Court should deny the AVG Defendants' motions to dismiss in their entirety.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. AVG US and AVG CZ Work Together to Sell and Promote Products Under the AVG Brand, Including their PC Tuneup Software.

Founded in 1991, the AVG brand (that comprises both AVG US and AVG CZ) develops and sells computer utility software worldwide. (First Amended Complaint, Dkt. No. 25 [cited as "FAC"] ¶ 14.) AVG boasts that it employs the "world's leading experts in software development, threat detection, threat prevention and risk analysis," and that its software provides "peace of mind to more than 108 million active users." *Id*. AVG has corporate offices throughout the world, including in Europe, the United Kingdom and the United States. (*Id*.)

AVG US and AVG CZ are sister subsidiaries who are both wholly owned and commonly controlled by AVG Technologies N.V. (*Id.* ¶ 18.) AVG CZ operates as AVG's primary European arm. (*Id.* ¶ 16.) As such, AVG CZ licenses the technology incorporated in the PC Tuneup software (from Defendant Auslogics), and is the registered administrator and operator of the AVG website (www.avg.com), through which many of AVG's software products, including PC Tuneup, are sold. *Id.*

For its part, AVG US acts as the U.S. equivalent of AVG CZ, assisting in the maintenance of the AVG website by reviewing marketing materials and licensing agreements (including the licensing agreement between AVG CZ and Auslogics here), and further selling the software through third-party resellers, both online and in packaged form at brick-and-mortar stores, such as Office Depot and Walmart. (*Id.* ¶¶ 4, 17.) Notably, users who navigate to AVG's PC Tuneup webpage are automatically directed to what appears to be the "U.S." version of the site, denoted by the presence of "US" in the webpage URL (www.avg.com/us-en/avg-pctuneup) and marked by the words "United Sates" next to an American flag visible at the bottom of the page. (*See* AVG webpage referred to in FAC ¶ 24.) Likewise, as a wholly owned subsidiary of AVG Technologies N.V., AVG US is a party to the www.avg.com Privacy Policy, which expressly states: "For the purposes of this Privacy Policy, AVG Technologies shall mean AVG Technologies CZ, s.r.o. or any other company controlled by, controlling or under common control [with it]." (*Id.* ¶ 29.) AVG US is also listed as the recommended contact for U.S. consumers visiting the AVG website. (*Id.* ¶ 30.)

AVG US and AVG CZ have also shared (and continue to share) numerous corporate officers, including their current Chief Executive Officer, J.R. Smith; their current Chief Operating Officer, Ralph Edward Clenton Richardson; AVG US's current Chief Web & Customer Officer and AVG CZ's current President and General Manager, R. David Ferguson; and, in varying capacities, John Little (AVG CZ's current Chief Financial Officer and AVG US's former Director, President, and Chief Executive Officer). (*Id.* ¶ 18.)

In addition to sharing the very same corporate officers who are responsible for making the ultimate design, marketing, and sales decisions with respect to PC Tuneup, AVG US is responsible for reviewing the marketing materials published on the AVG website, including

those described in Paragraphs 21-24 of the FAC. Both AVG US and AVG CZ were and are directly involved in the design, marketing and sale of PC Tuneup, and together, mislead and defraud consumers into purchasing their software as alleged in the FAC.

**B. The AVG Defendants Misrepresent PC Tuneup's Functionality Through their Websites, Marketing Materials, and In-Software Statements.**

Through their websites and marketing materials, the AVG Defendants represent that the PC Tuneup software is capable of increasing computer speed or performance, removing harmful errors, increasing computer stability and protecting users' privacy. (*Id.* ¶¶ 21, 23.) To convince consumers of the software's supposed utility, and to encourage them to purchase the full version of PC Tuneup, Defendants recommend that consumers download a free trial version of PC Tuneup (good for 24 hours) and conduct a free diagnostic "scan" to detect issues and other problems existing on their computers. (*Id.* ¶¶ 32-33.) After the user does so, the free scan invariably reports the existence of numerous errors and other problems on the computer. (*Id.* ¶ 34.) AVG further represents that these errors, often characterized as "Severe," can be "fixed" if the consumer continues to use the software (at a price of $39.99, of course), and that weekly scans using the full version of the software are recommended to identify and eliminate these threats going forward. (*Id.* ¶¶ 34-36.)

Despite Defendants' representations, however, the free trial version of PC Tuneup does not accurately or genuinely identify errors, severe threats, or other problems on a user's computer. Instead, AVG intentionally designed the software to misrepresent and exaggerate the existence and severity of errors and problems on a consumer's PC so as to induce them to purchase the full version of the software. (*Id.* ¶¶ 37-39.) Further, once purchased, the full version of the software operates in a nearly identical and deceptive manner and thus, lulls the consumer into a false sense of security that the software is functioning as advertised (by "identifying" and

then "fixing" supposed errors). (*Id.* ¶ 38.) Since the full version is designed in the same deceptive manner, it is likewise incapable of repairing reported errors and problems, or otherwise functioning as advertised by AVG. (*Id.* ¶ 26.)

**C. Theis Relied On The AVG Defendants' Fraudulent Misrepresentations and Purchased the Full Version of the PC Tuneup Software.**

In April 2011, Plaintiff Theis performed an Internet search for software that would enhance his computer's performance. (*Id.* ¶ 45.) In the search results, he viewed advertisements that directed him to AVG's website, where they specifically represented that PC Tuneup would "boost Internet speed," "eliminate freezing and crashing," and "optimize disk speeds" on users' computers. (*Id.* ¶¶ 45-46.) In reliance upon those representations about the utility and functionality of PC Tuneup, Theis downloaded the free trial version of the PC Tuneup software to run a diagnostic scan of his computer. (*Id.*) After performing the scan, the software reported that Plaintiff's PC had numerous "Severe" errors. (*Id.* ¶ 46.) It then advised Theis to perform weekly diagnostic scans of his computer, and recommended that he purchase the full version of the PC Tuneup software in order to do so. (*Id.* ¶ 46.)

After his 24-hour trial of the software expired, and believing that PC Tuneup's initial diagnosis and representations were honest and accurate, Theis agreed to and, in fact, did pay to purchase the full version of PC Tuneup in an effort to protect his computer from and repair such errors and threats in the future. (*Id.* ¶ 47.) Plaintiff later discovered that the full version of the PC Tuneup software could not and did not perform as advertised. (*Id.* ¶ 48.)

**D. Plaintiff's Expert Exposes PC Tuneup's Deceptive Design and Marketing.**

Following his purchase of the PC Tuneup software and acting through his counsel, Plaintiff engaged a computer forensic expert to examine both the trial and full versions of PC Tuneup. (*Id.* ¶ 37.) The expert's investigation confirmed that the free version of PC Tuneup

*always* reports that a user's computer is afflicted by "severe" errors that need repair and *always* reports that weekly scans are recommended to identify and eliminate these supposed threats. (*Id.*) Worse, Plaintiff's expert determined that many of the purported errors PC Tuneup identifies *are not credible threats* to a computer's functionality at all, and further, that Defendants programmed both the free and full versions of PC Tuneup to, *inter alia*, (i) always identify problems on a user's computer (even where none exist), (ii) artificially inflate the number of errors detected on a user's computer, (iii) characterize innocuous items as severe, and (iv) inform the user that "weekly scans" using the software are recommended. (*Id.* ¶ 39.)

**E. The Same Fraudulent Methods Are Used Throughout the Utility Software Industry.**

Unfortunately for consumers, Defendants are not alone in their use of the deceptive programming design and marketing practices at issue in this case. Rather, as alluded to above, the utility software industry has been fraught with these unscrupulous practices for over a decade. It is only recently, however, that consumers have caught on and software developers—like the AVG Defendants and their competitors—have been called to account for the fraudulent ways in which they profit off the legitimate fears of average consumers (who are also unable to identify the fraudulent technological design and methodologies underlying this type of supposedly performance enhancing software).

Indeed, numerous lawsuits have been filed against well-known competitors of AVG (e.g., Symantec Corp. and McAfee, Inc.)—including several by Plaintiff's counsel here—alleging similar claims related to the fraudulent design and marketing of so-called utility software products. However, contrary to Defendants' characterization of this case as merely "one of multiple 'cookie-cutter' putative class actions" brought by Plaintiff's counsel against the industry, several of those cases have resulted in multi-million dollar classwide settlements and

industry-changing modifications to the software products at issue—making their detection, reporting and repairing mechanisms far more transparent and accurate when it comes to threats posed by existing errors on computers.[5] With the exception of *Parker v. iolo*, the cases that haven't settled are actively being litigated or are themselves on their way to settlement.[6] Moreover, the courts in each of the cases have largely accepted the plaintiffs' legal theories, which are similar to those alleged here. *See, e.g., Kulesa*, No. 12-cv-725, Dkt. 49 (dismissing complaint with leave to replead to add some additional factual detail); *see also Gross*, No. C 12-00154 CRB, 2012 WL 3116158 (N.D. Cal. July 31, 2012) (same).

Rather than make the necessary changes to their software so that it *actually* detects, reports and repairs harmful errors and problems on users' PCs, however, the AVG Defendants have remained steadfast in their fraudulent conduct and, to this day, continue to profit from it.

## III. ARGUMENT

On a motion to dismiss, "the court must construe the complaint in the light most favorable to the plaintiff and take all allegations as true." *Pujol v. Shearson/American Express, Inc.,* 829 F.2d 1201, 1202 (1st Cir.1987). While federal pleading standards require more than "formulaic recitation of the elements" of a claim or "naked assertions," a complaint survives dismissal where it allows the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555-57 (2007)). As explained below, Plaintiff's FAC readily meets and exceeds these standards.

---

[5] *See, e.g., Webb*, No. 1:11-cv-04141; *Lagarde*, No. 3:12-cv-00609; *Ledet*, No. 2:11-cv-00294; *Drymon*, No. 11-CH-16779.

[6] *See, e.g., Gross,* No. 3:12-cv-00154-CRB (where the parties have informed the court that they are proceeding with a second private mediation before John Bates of JAMS in early November).

### A. As An Initial Matter, Plaintiff Has Pleaded A Concrete and Particularized Injury Sufficient To Confer Standing.

Defendants first argue that Plaintiff has supposedly failed to allege facts establishing that he suffered a concrete and particularized injury such that he has standing to sue. (*See* AVG US's Motion to Dismiss FAC ("AVG US Mot.") 6; AVG CZ's Motion to Dismiss FAC ("AVG CZ Mot.") 3.)[7] Specifically, Defendants contend that Theis lacks standing because the FAC doesn't allege facts sufficient to show that (i) "he personally was injured," (ii) "AVG PC Tuneup failed to provide any of the [] advertised benefits to his particular computer," or (iii) how PC Tuneup "specifically functioned on [his] computer." (AVG US Mot. 8.) Those arguments simply ignore the plain allegations of the FAC. This seems to be the argument of the day for defendants in these cases following the ruling in *Parker v. iolo*. But as explained below, Defendants' argument in this regard is weak as no other court has endorsed the decision in *Parker* and, in fact, one of its sister courts in the Central District of California recently rejected its holding. *See Kulesa*, No. 8:12-cv-00725, Dkt. No. 49, at 6-7.

To show standing, Theis must "demonstrate that [he] has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Mass. v. E.P.A.*, 549 U.S 497, 517 (2007); *see also Whitmore v. Ark.*, 495 U.S. 149, 154 (1990). Even though the burden of establishing standing lies with the party asserting federal jurisdiction, "the manner and degree of evidence necessary to meet this burden varies depending on the stage of litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555*,* 561 (1992). At the pleading stage, "general factual

---

7 As a preliminary note, the motion to dismiss filed by AVG US largely incorporates the argument section of AVG CZ's motion to dismiss, and thus, Plaintiff's response to each specific argument properly refers to both Defendants. *See, e.g.,* AVG US Mot. 16, n.9 ("Even if AVG USA were a party to the contract at issue, this claim should still be dismissed for the reasons set forth in Section II.B.4 of the accompanying brief of AVG CZ."); AVG US Mot. 17, n. 11 ("Even if AVG USA were subject to the contract's implied covenant, this claim should still be dismissed for the reasons set forth in Section II.B.5 of the accompanying brief of AVG CZ.").

allegations of injury resulting from the defendant's conduct may suffice." *Id.* (internal citations and quotations omitted). Here, Theis's injuries easily meet the requirements for standing at this stage of the litigation.

First, Plaintiff repeatedly makes specific allegations that the PC Tuneup software he purchased failed to perform the beneficial tasks as represented (i.e., that it failed to accurately scan and report errors and was incapable of repairing the reported errors and threats to his computer) and resulted in economic injury in the amount of the money he paid for software that did not work as advertised (the specific injury). (FAC ¶¶ 47-48, 66-67) (*see* FAC ¶ 48) ("The full version of the PC Tuneup software that Theis purchased could not and did not perform as represented... Further, the software was incapable of repairing the reported errors and problems."); *see also Sierra Club v. Morton*, 405 U.S. 727, 733 (1972) ("[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing, with or without a specific statutory provision for judicial review."). Plaintiff expressly alleges that he personally purchased the full version of the software (which he later learned does not do what Defendants purport) and was injured in the amount of his overpayment for the product. (FAC ¶¶ 47-49.) Further, Defendants' marketing and sale of a product that lacked the advertised qualities deprived Plaintiff of the benefit of his bargain. This type of economic harm is quantifiable, directly traceable to Defendants' unlawful conduct, and redressable by damages.

Second, the injuries are particularized, because they are specific to Plaintiff in a personal way. *See Lujan*, 504 U.S. at 560 n.1. ("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way."). Plaintiff himself downloaded the trial version of PC Tuneup and used it to scan his personal computer. Plaintiff then purchased and installed the full version of PC Tuneup on his computer (in reliance on the results of the scan, as well as on

Defendants' representations as to what the software could do). Finally, Plaintiff himself suffered harm in the form of money paid for software that did not function as advertised and that did not —and could not—enhance the performance of or repair the errors and threats reported to be on his computer.

Plaintiff's damage theory has been recognized and endorsed by courts across the country, including in Massachusetts. *See Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 399 (2004) ("As a result of the defendants' deceptive advertising, all consumers of Marlboro Lights in Massachusetts paid more for the cigarettes than they would have otherwise paid... This is a variation on the traditional 'benefit of the bargain' rule that awards a defrauded party the monetary difference between the actual value of the product at the time of purchase and what its value would have been if the representations had been true."); *Eldridge v. Gordon Bros. Group, LLC*, No. CIV.A. 08-11254-DPW, 2011 WL 3439180 (D. Mass. Aug. 4, 2011) ("For claims of fraudulent inducement, a plaintiff may request benefit of the bargain damages. [] The rationale is 'that a defrauded party is entitled to the benefit of his bargain in a transaction and should be placed in the same position that he would have occupied had the false representations on which he acted been true.'") (internal citations omitted); *see also Gross v. Symantec Corp.*, No. 3:12-cv-00154, Dkt. No. 49 (N.D. Cal. Aug. 14, 2012) at *6 ("The FAC alleges the results of an investigation by computer forensic experts, *and not the actual status of Plaintiff's computer*, revealed the falsity of Symantec's representations" and "[a]s Plaintiff's belief derives from the results of the forensic analysis, the allegations in the FAC sufficiently establish a basis for believing Symantec's statements to be false.") (emphasis added); *Wang v. OCZ Tech. Group, Inc.*, 276 F.R.D. 618, 625 (N.D. Cal. 2011) (finding "[t]he fact that [Plaintiff] does not state the purchase price...allege an exact dollar amount in lost value, or point to the specific

advertisements relied upon in his purchase is not determinative" and that it is "sufficient that [Plaintiff] has alleged [] [Defendant] misrepresented [] performance and capacity characteristics through its product packaging, marketing materials, and website, and that this conduct caused him either to buy a product that he would not have bought, or to buy a product that was inferior, of lower quality and less value, than that offered.").

Most recently, in *Kulesa*, a putative class action involving similar allegations that the defendant fraudulently designed and marketed supposed utility software, Judge James V. Selna of the Central District of California rejected the very same arguments raised by the AVG Defendants here.[8] No. 8:12-cv-00725, Dkt. No. 49. There, Judge Selna held that "[t]he purchase of computer software that does not perform the advertised functions can constitute economic harm that satisfies the Article III standing requirement of concrete and particularized harm." *Id.* (quoting *Parker v. iolo Technologies, LLC*, No. 2:12-cv-00984-GAF-MAN, Dkt. No. 63 at 5 (C.D. Cal. Feb. 03, 2012)). In particular, the court found that the allegations that the software's "diagnostic scan [falsely indicated] that the computer's health, performance and security were at 'critical' risk and required immediate purchase of the product" were sufficient to establish that the plaintiff had overpaid, did not receive the benefit of the bargain, and thus, had standing to sue. *Id.* (citing *In re Toyota Motor Corp. Unintended Acceleration Mktgs., Sales Practices, and Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1164 (C.D. Cal. 2010) ("As long as plaintiffs allege a legally cognizable loss under the 'benefit of the bargain' or some other legal theory, they have standing."); *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 595 (9th Cir. 2012) (holding the

[8] Like AVG here, the defendant's arguments in *Kulesa* focused primarily (and improperly) on how the plaintiff's individual copy of the software performed on her particular computer. (*See* AVG US Mot. 8.) But, the manner in which an individual consumer's copy of the software operated, specifically, is not what Plaintiff Theis (nor the plaintiff in *Kulesa*) alleges his injury should be traced to. Rather, Plaintiff's injury lies with his purchase of software that couldn't perform the beneficial tasks that Defendants promised it could—as confirmed by Plaintiff's expert's analysis of the software—and thus, wasn't worth the price that he paid for it. The *Kulesa* court agreed and so should this Court.

injury-in-fact requirement was met where plaintiffs alleged that they would not have purchased their vehicles in the absence of defendant's misrepresentations)). That's exactly what Plaintiff Theis claims happened here, so the result should be no different.

At their core, Defendants' arguments (just like those made unsuccessfully by the defendant in *Kulesa* previously) amount to little more than an attack on Plaintiff's counsel for filing similar lawsuits against other fraudulent software operators—as if his attorneys have somehow created the fraudulent software industry. Indeed, Defendants repeatedly (and almost exclusively) cite to the *Parker* case where the court admittedly reached an unfavorable conclusion on facts similar to those alleged here. But, it's no surprise that not a single other court presiding over one of these fraudulent software cases has reached a similar result. That's because the court's decision in *Parker* failed to consider the arguments offered here (and in *Kulesa*)—in particular, that Plaintiff's injury was his receipt of a product of diminished value and that he had been denied the "benefit of the bargain"—and instead, focused almost entirely on the plaintiff's specific experience in that case, holding that the complaint did not allege facts demonstrating the software failed to function as advertised. Ultimately, the *Parker* court's decision is at odds with rulings made by other courts (including those in its own District), and, in any event, should not be controlling in this case.

Accordingly, Plaintiff has sufficiently pled a concrete and particularized injury and has standing to pursue his claims.

**B. Massachusetts Law Is Controlling: Neither The AVG End User License Agreement, Nor Its Choice of Law Provision, May Be Considered and Choice Of Law Principles Require Its Application.**

Next, pointing to their EULA's choice of law provision, AVG contends that Delaware, not Massachusetts, law must be applied here. That argument fails for two reasons. First, the

EULA cannot be considered because it wasn't relied upon, referenced or otherwise incorporated into the FAC and therefore, fails to meet the requirements of the incorporation by reference doctrine. Second, under the circumstances of this case, Massachusetts choice of law principles—which apply regardless—require that Massachusetts law be applied.

*1. The End User License Agreement (EULA) cannot be considered because it has not been incorporated by reference.*

Despite it not being referenced in Plaintiff's FAC, Defendants improperly request that the Court consider the EULA under the "incorporation by reference" doctrine. That request should be denied. In considering a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint, and other matters of which judicial notice can be taken. *Nollet v. Justices of the Trial Court of Mass*., 83 F. Supp. 2d 204, 208 (D. Mass. 2000), *aff'd*, 248 F.3d 1127 (1st Cir. 2000); *see also Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 17 (1st Cir. 1998); *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc*., 524 F.3d 315, 321 (1st Cir. 2008). Courts have made narrow exceptions for documents "the authenticity of which are not disputed by the parties, for official public records, for documents central to plaintiffs' claim or for documents sufficiently referred to in the complaint." *Freeman v. Town of Hudson*, 849 F. Supp. 2d 138, 147 (D. Mass. 2012) (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)).

AVG's EULA does not fall into any of these exceptions. It's not attached to Plaintiff's FAC, it's not referred to in the FAC, it's not a public record, its authenticity is in dispute, and it's not central to Plaintiff's claims. Not surprisingly, other courts considering this issue on motions to dismiss in the other fraudulent software cases referenced by Defendants have declined to acknowledge purportedly applicable EULAs. *See, e.g*., *Gross v. Symantec Corp.*, 2012 WL 3116158, at *11 ("Although the FAC does acknowledge the existence of the EULA, it does not

include any factual allegations related to the content of the agreement, so the EULA cannot be 'central to the allegations.' Furthermore, Plaintiff challenges the enforceability of the EULA. Therefore, the Court declines to consider the EULA at this stage."); *Kulesa*, No. 8:12-cv-00725, Dkt. No. 49 at *15 ("The FAC does not include factual allegations related to the content of the agreement, nor is it evident that Plaintiff relies on the License. PCI counters that because Plaintiff asserted a breach of contract claim and the License states it is 'the entire agreement' between the purchaser and PCI. Nonetheless, the Court finds that the License is not clearly 'central to the allegations' and declines to consider it at this stage of the litigation."). Thus, the EULA (along with its supposed disclaimers and choice of law provision) is not the proper subject of judicial notice and should not be considered by the Court.

*2. Given that the EULA does not apply, Massachusetts choice of law principles require that Massachusetts law, rather than the laws of any other jurisdiction, be applied to Plaintiff's claims.*

Since the EULA cannot be properly considered, the Court must turn to the applicable Massachusetts choice of law principles, which require that the substantive laws of this state apply. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that in a diversity action, the choice-of-law rules that apply are those of the forum state). In cases such as this where no choice-of-law provision applies, Massachusetts courts utilize a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole," and look to the Restatement (Second) of Conflict of Laws (1971) as an "obvious source of guidance." *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 127 (D. Mass. 2011) (citing *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631–32 (1985)). The Restatement outlines seven relevant factors, including: "the protection of [the parties'] justified expectations," "certainty, predictability, and uniformity of result," and "ease in determination

and application of the law to be applied."[9] Restatement (Second) of Conflict of Laws § 6(2)(d), 6(2)(f), 6(2)(g) (1971).

Here, the relevant factors weigh heavily in favor of applying Massachusetts law. First, Plaintiff Theis (a Minnesota resident) viewed Defendants' online advertisements and entered into a contract whereby he agreed to purchase AVG's PC Tuneup software on the AVG website. As explained, the website explicitly refers to its location as being within the "US" in its URLs and contains the words "United States", along with an image of the American flag, on the bottom of each page. Further, the website names AVG Technologies USA—the only AVG entity located within the U.S., and Massachusetts in particular—as the appropriate contact for customer support. Thus, Plaintiff reasonably expected that he was visiting a website operated by AVG US, from within the United States and Massachusetts, and contracting with that U.S. entity (which he did).

AVG US is also headquartered in and conducts its business from within Massachusetts—including the fraudulent conduct of which Plaintiff complains and thus, has availed itself of the substantive laws of this state. (*See* FAC ¶¶ 10, 12-13.) As a result, Massachusetts necessarily has an interest in seeing its laws enforced over those of another jurisdiction. That's especially true given that the only other options are (i) Delaware—which has no contacts with this case other than AVG US's incorporation there; (ii) Minnesota—which although it is Plaintiff's home state, is inapplicable because he has chosen to proceed with his claims in Massachusetts, where AVG US is located and the conduct of which he complains arose; or (iii) the Czech Republic—which not even the Defendants suggest should apply. *See Watkins v. Omni Life Sci., Inc.*, 692 F. Supp.

---

[9] The complete list of Restatement factors are: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of the result, and (g) ease in determination and application of the law to be applied. Restatement (Second) of Conflict of Laws § 6(2) (1971).

2d 170, 175 (D. Mass. 2010) ("it is [] plain [] that Massachusetts' interest in regulating the conduct of businesses operating under its laws trumps any interest that [another state] might have. If this case were to achieve class action status, some 1,500 class members representing all fifty states would be affected. It stands to reason that among this geographically diverse group, Massachusetts is the only state that would have a substantive tie to all of the class members.").

Moreover, application of one of the other potential jurisdiction's laws could be contrary to Massachusetts public policy. *See Roll Sys., Inc. v. Shupe*, No. CIV. A. 97-12689-GAO, 1998 WL 1785455, at *2 (D. Mass. Jan. 22, 1998) (quoting Restatement (Second) of Conflict of Laws § 187(2)(b) (1971)) ("Massachusetts courts will not honor the parties' choice-of-law if the application of that provision: '[1] would be contrary to a fundamental policy of a state; which has [2] a materially greater interest than the chosen state in the determination of the particular issue; and which ... [3] would be the state of the applicable law in the absence of an effective choice of law by the parties.'"). For example, consistent with its policy of protecting consumers from sellers who attempt to limit their remedies under warranty, Massachusetts specifically prohibits sellers from disclaiming the implied warranty of merchantability in consumer contracts. *See* G.L. c. 106, § 2-316A (1992 ed.) ("Any language, oral or written, used by a seller or manufacturer of consumer goods and services, which attempts to exclude or modify any implied warranties of merchantability and fitness for a particular purpose or to exclude or modify the consumer's remedies for breach of those warranties, shall be unenforceable."); *Back v. Wickes Corp.*, 375 Mass. 633, 640 (1978) (The warranty duty is "one imposed by law as a matter of social policy, and not necessarily one which the defendant has acquired by contract."); *Cigna Ins. Co. v. Oy Saunatec, Ltd.*, 241 F.3d 1, 15 (1st Cir. 2001) ("Actions under Massachusetts law for breach of the implied warranty of merchantability are the functional equivalent of strict liability in other

jurisdictions, and they are as comprehensive as the strict liability provision in section 402A of the Restatement (Second) of Torts.") By contrast, Delaware allows such disclaimers, which would ultimately defeat Plaintiff's claim for Defendants' breach of the implied warranty of merchantability. *See* Del. Code tit. 6, § 2-316 ("Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'"); *see also* Minn. Stat. § 336.2-316 (same).

Finally, the interests of certainty, predictability, and uniformity of result require the application of Massachusetts law as well. *See Daynard v. MRRM, P.A.*, 335 F. Supp. 2d 156, 165 (D. Mass. 2004) ("In addition, this Court considered the certainty, predictability, and uniformity of result….[and] found it reasonable to turn to the location where the conduct complained of took place, the state where the parties' relationship is centered, and the place of business of the parties."). Here, Plaintiff alleges that the fraudulent conduct at least partially took place from AVG US's headquarters in Massachusetts, which is also AVG US's principal place of business. (*See* FAC ¶ 12) ("Defendants conduct business in Massachusetts and the unlawful conduct alleged in this Complaint, in part, occurred in, was directed to, and/or emanated from Massachusetts."). Further, as Plaintiff's claims against both AVG Defendants arise from the same pattern of deceptive conduct, as well as the same fraudulently marketed and designed product, the same choice of law should be applied to both Defendants to ensure certainty, predictability, and uniformity of result. As such, a choice of law analysis favors the application of Massachusetts law.

Accordingly, Defendants' assertion of Delaware and Minnesota law applying should be disregarded, and Massachusetts law applied to each of Plaintiff's claims against Defendants.

### C. Theis Alleges Sufficient Facts to Support A Finding That AVG US Was Directly Involved in the Conduct at Issue.

In attacking Plaintiff's substantive claims, Defendants first argue that the FAC does not sufficiently establish AVG US's involvement in the fraudulent conduct at issue and further, that AVG US is not a party to Plaintiff's contract for purchase of the PC Tuneup software and therefore, cannot be liable for his alleged injuries. Those arguments fail for two reasons. First, Plaintiff outlines in more than sufficient detail AVG US's role in the alleged fraudulent scheme, including making the misrepresentations found on the AVG website and obtaining the technology underlying the software. Secondly, the FAC shows that AVG US and CZ are mere alter-egos and that treating them as separate entities would result in injustice.

#### *1. Plaintiff sufficiently alleges that AVG US was directly involved in the fraudulent design and marketing of the PC TuneUp software.*

First, the FAC expressly outlines (in detail) AVG US's role in the fraudulent conduct at issue here. Specifically, Plaintiff alleges that AVG US assists in the maintenance of the AVG website by reviewing marketing materials and other representations made on the site, including the representations he viewed and relied upon in purchasing the PC TuneUp software. (FAC ¶¶ 4, 17.) In that role, the company is also recognized as a party to the www.avg.com Privacy Policy and is identified as the recommended contact for U.S. consumers visiting the site. (*Id.* ¶¶ 29-30.) ("For the purposes of this Privacy Policy, AVG Technologies shall mean AVG Technologies CZ, s.r.o. or any other company controlled by, controlling or under common control [with it].") Additionally, it's also responsible for reviewing licensing agreements related to the AVG brand, including the agreement between AVG CZ and Defendant Auslogics for the technology underlying the PC TuneUp software, and sells the software throughout the U.S. through third-party resellers, both online and in packaged form at brick-and-mortar stores like

Office Depot and Walmart. (*Id.*)

*2. AVG US and AVG CZ are one and the same entity.*

Even if those allegations were not enough to establish AVG US's involvement in the fraudulent scheme at issue (they are), it still can't escape liability for the alleged unlawful conduct. That's because the FAC makes clear that there is such a unity of interest and ownership that the supposed separate personalities of AVG US and AVG CZ just don't exist and thus, it would be inequitable not to treat them as one and the same entity. *See Attorney Gen. v. M.C.K., Inc.*, 432 Mass. 546, 555 (2000) (disregarding the corporate form is "an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice."); *see also Zimmerman v. Puccio*, 613 F.3d 60, 73-74 (1st Cir. 2010) (citing *Hanson v. Bradley*, 298 Mass. 371 (1937)) (holding that it is the "right and the duty of courts to look beyond the corporate forms" when necessary "for the defeat of fraud or wrong, or the remedying of injustice.").

Under Massachusetts law, a court may choose to disregard the corporate form in either of two situations: (1) when one body exercises "some form of pervasive control" over the activities of the subsidiary and the intercorporate relationship results in "fraudulent or injurious consequence", or (2) "when there is a confused intermingling of activity of two or more corporations engaged in common enterprise…or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." *TechTarget, Inc. v. Spark Design, LLC*, 746 F. Supp. 2d 353 (D. Mass. 2010) (citing *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968)). Although the courts have articulated a twelve-factor test to assist in the determination,[10] overarching the point-by-point

---

[10] Courts generally look to the following twelve factors: (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6)

analysis are equitable considerations. *Evans v. Multicon Constr. Corp.,* 30 Mass. App. Ct. 728, 736 (1991); *see also Berger v. H.P. Hood, Inc.,* 416 Mass. 652, 657 (1993) (corporate form may be disregarded where it "is a sham, or is used to perpetrate deception to defeat a public policy"). Indeed, regardless of the factors, courts have generally found reason to disregard the corporate form in situations such as this, where there is "an element of dubious manipulation and contrivance, finagling, such that the corporate identities are confused and third parties cannot be quite certain with what they are dealing." *Hewitt v. Bay State Gas Co.*, 63 Mass. App. Ct. 1121, at *2 (2005).

Successful invocation of this so-called "alter ego doctrine requires a showing that businesses, although separately incorporated, have been operated in so imbricated a manner as to justify a reasonable perception that they [are] one and the same." *Commonwealth Aluminum Corp. v. Baldwin Corp.*, 980 F. Supp. 598, 605 (D. Mass. 1997) (citing *United Elec., Radio & Mach. Workers of America v. 163 Pleasant Street Corp.,* 960 F.2d 1080, 1095–96 (1st Cir. 1992)); *see also Zimmerman*, 613 F.3d at 75 (disregarding the corporate form where plaintiffs were utterly "misled about which corporate entity-[Cambridge or BC Mass]-was obligated to them or was dealing with them.").

In this case, the Court should find that AVG US and AVG CZ are one and the same entity because (as will be borne out by discovery) (1) the two are commonly owned by the same parent, AVG Technologies, N.V; (2) are "pervasively" controlled by the same source, as they share numerous corporate officers and employees responsible for the design, marketing and sale

---

absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud." *Attorney Gen. v. M.C.K., Inc.*, 432 Mass. at 555 n. 19; *see also Evans v. Multicon Constr. Corp.,* 30 Mass. App. Ct. 728, 733 (1991); *Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc.,* 754 F.2d 10, 14-16 (1st Cir. 1985). "[T]he exercise is…not one in counting." *Evans v. Multicon Constr. Corp.,* 30 Mass.App.Ct. at 736. The factors are simply to be examined "to form an opinion whether the overall structure and operation misleads." *Id.*

of the software at issue, including their Chief Executive and Chief Operating Officers—the two top ranking executives; and (3) the intercorporate relationship between them has resulted in "fraudulent or injurious consequence", inasmuch as they've worked together to jointly misrepresent the functional capabilities of PC TuneUp to induce consumers to purchase the software. Indeed, there has been such significant and confusing intermingling of activity that there is serious ambiguity about the manner and capacity in which each entity acts. For example, AVG US reviews the marketing statements made on the AVG website, reviews the licensing agreements that AVG CZ enters into with third parties, sells the exact same software products as AVG CZ, and provides customer support services to consumers purchasing PC TuneUp. (FAC ¶¶ 17, 28-31.) Nevertheless, Defendants claim that it's really AVG CZ behind the software.

Adding to the confusion, the AVG website (also purportedly administered by AVG CZ) is replete with indications that it's operated from within the United States by an American entity (e.g., the "US" located in each URL and the American flag displayed at the bottom of each page), which is compounded by the fact that consumers are directed to contact AVG US, not CZ, with any issues concerning the software. Likewise, the website almost exclusively (and ambiguously) refers to "AVG Technologies" rather than any specific entity.[11] The end result of this is that consumers reasonably believe they're dealing with just one entity.

Moreover, allowing AVG US to avoid liability here would be inequitable. That is, without AVG US as a party to this action, Plaintiff (and the putative Class) may be required to litigate against two foreign entities—AVG CZ in the Czech Republic and Auslogics in Australia—and even if they are successful in obtaining a favorable judgment, will bear the burden, expense and uncertainty of enforcing it oversees (which Defendants no doubt considered

---

[11] Notably, AVG CZ is not referenced by name anywhere on the primary pages of the website, including the initial landing page (www.avg.com), the front page for PC TuneUp (http://www.avg.com/us-en/avg-pctuneup), nor the checkout page (https://eshop.avg.com/us-en/cart?step=customer).

when designing their business operations). In the end, the Defendants shouldn't be rewarded for their evasive conduct and the Court should find that they are properly treated as one and the same entity.[12]

**D. Plaintiff Satisfies Rule 9(b)'S Heightened Pleading Standard For His Fraudulent Inducement Claim.**

Turning to the substantive allegations of Plaintiff's claims, Defendants argue that the FAC fails to satisfy the heightened pleading requirements of Rule 9(b), inasmuch as it supposedly "fail[s] to clearly specify the representation(s) upon which [Plaintiff] relied ", "does not allege with particularity that the relevant statements [] were false", and does not allege that the representations were made "with an intent to deceive". (AVG CZ Mot. 8-9.) Those arguments miss their mark.

In order to adequately state a claim for fraud, Rule 9(b) requires that a party "allege the time, place and contents of the alleged misrepresentation, as well as the identity of the person making them." *Kiah v. Aurora Loan Services, LLC*, No. CIV.A10-40161-FDS, 2011 WL 841282, *5 (D. Mass. Mar. 4, 2011); *see also Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996). The complaining party's reliance on those statements must also be pleaded with particularity. *Aliberti v. GMAC Mortgage, LLC,* 779 F. Supp. 2d 242, 248 (D. Mass. 2011); s*ee also Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443 (2002) (quoting *Danca v. Taunton Sav. Bank,* 385 Mass. 1 (1982)) ("To establish a claim for fraud under Massachusetts law, a

---

12 Delaware and Minnesota law involve similar considerations of equity and fraud. *See Blair v. Infineon Technologies AG*, 720 F. Supp. 2d 462, 470 (D. Del. 2010) ("This court has required an element of fraudulent intent in its alter ego test, as well as the traditional requirement that the corporation and its subsidiaries operated as a single economic entity"); *see also Stoebner v. Lingenfelter*, 115 F.3d 576, 579 (8th Cir. 1997) ("Under Minnesota law, deciding whether to allow a corporate veil to be pierced requires a court to 1) analyze whether the corporation functioned as the mere instrumentality of the principals a party is attempting to reach by piercing the corporate veil, and 2) determine whether injustice or fundamental unfairness would occur if the corporate veil were left intact."); *Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole*, 766 N.W.2d 334, 339 (Minn. Ct. App. 2009) ("When using the alter ego theory to pierce the corporate veil, courts look to the reality and not form, with how the corporation operated and the individual defendant's relationship to that operation.") (internal citations and quotations omitted).

plaintiff must prove that 'the defendant made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage.'").

The FAC here provides the detail required by Rule 9, including the requisite time, place, and content of Defendants' fraudulent conduct. Specifically, Plaintiff alleges that in April 2011 ("when") while searching on the Internet he came across the AVG website ("where"), viewed Defendants' representations about the functional capabilities of the PC TuneUp software, and relied upon those representations by downloading the free version of the software and running a diagnostic scan of his PC ("what"). Plaintiff also viewed specific representations regarding the supposed health and performance of his PC made within the software itself and, as a result of his reliance on those representations and the ones made on the AVG website, purchased a full version of the software ("what") from the AVG Defendants ("who"). (FAC ¶¶ 45-49.)

The AVG Defendants' misrepresentations (the "content") are specifically detailed and expressly quoted throughout the FAC, including that Defendants made uniform misrepresentations—to Plaintiff, specifically, and the putative Class, generally—about what PC TuneUp is capable of doing (i.e., "Boost your Internet speed"; "Eliminate freezing and crashing"; "Optimize disk speeds"; "Protect you privacy"; "Monitor hard drive health and space"; and "Restore your PC to peak performance") (*Id.* ¶¶ 21-25), how it purports to do those things (*Id.* ¶¶ 33-36), how it notifies consumers of supposed errors and other problems on their PCs and promotes the purchase of the full PC Tuneup product (*Id.*), and why Defendants intentionally make those representations—i.e., to deceive consumers into believing their computers suffer from errors so as to induce them into purchasing (and enable Defendants to profit from) the full version of the PC TuneUp software. (*Id.* ¶ 37.)

Further, the FAC makes clear that Defendants knew their representations were false inasmuch as Plaintiff's computer forensics expert confirmed that they were, and that they intended that Plaintiff and the Class would rely upon the representations by purchasing a full version of the software. (*Id.* ¶¶ 37-39, 86.) ("Defendants designed their public representations specifically to mislead consumers about PC Tuneup's utility, and intentionally programmed their software to falsely report and exaggerate the existence of errors and to deceive users about the status of their computers. Defendants intended that their misrepresentations would induce consumers to purchase their PC Tuneup software."). It also describes how Plaintiff and the Class did, in fact, rely upon Defendants' representations by purchasing the software and were ultimately injured in the form of the difference between what was paid and the actual value of the software, which did not perform as Defendants advertised. (*Id.* ¶¶ 45-49, 87.)

Ultimately, the FAC carefully details Defendants' misrepresentations and methods for inducing consumers into purchasing the PC TuneUp software and therefore, satisfies the rigors of Rule 9(b).

**E. The Representations Found in Defendants' Advertising Materials, in Their Software, and on Their Website Form the Express Warranties That They Ultimately Breached.**

Defendants next argue that Plaintiff's claim for breach of express warranties cannot stand because, purportedly (i) the UCC does not apply to software licenses, (ii) the PC TuneUp EULA (which Defendants improperly ask the Court to consider) provides the terms of Defendants' express warranties and disclaims all other warranties, and (iii) Defendants have not breached any of those warranties. Each of these arguments fails and is taken in turn below.

*1. The PC Tuneup software is a "good" under the UCC.*

Defendants take the position that PC Tuneup is not considered a "good" under the

U.C.C., but rather is merely a license to use the software (and thus, presumably a service). (AVG CZ Mot. 4.) However, courts throughout the country have consistently distinguished cases such as this, where the transaction involves the purchase of a software product, from those cases that involve the design of a software product and/or a transfer of the corresponding intellectual property rights. In the former, as in this case, the software has properly and consistently been classified as a "good" for purposes of the U.C.C. *See*, *e.g., RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546-47 (9th Cir. 1985) (applying California law); *ePresence, Inc. v. Evolve Software, Inc.*, 190 F. Supp. 2d 159, 163 (D. Mass. 2002) (applying California law); *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 654 (7th Cir. 1998) (applying New Hampshire law); *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 675–76 (3d Cir. 1991) (applying Pennsylvania law); *Newcourt Fin. USA, Inc. v. FT Mortgage Cos.*, 161 F. Supp. 2d 894, 897 (N.D. Ill. 2001) (applying Illinois law); *Dahlmann v. Sulcus Hospitality Technologies, Corp.*, 63 F. Supp. 2d 772, 775 (E.D. Mich. 1999) (applying Michigan law); *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 432 (S.D.N.Y. 1996) (applying New York law); *Olcott Int'l & Co., v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1071 (Ind. App. 2003). In particular, courts have reached the same conclusion in the context of computer utility software similar to PC TuneUp here. *See Gross*, 2012 WL 3116158, at * 9 (holding that California's U.C.C. covered defendant Symantec's "Registry Mechanic" software); *Kulesa*, No. 8:12-cv-00725, Dkt. No. 49 at 12 (holding that current law supported plaintiff's contention that the defendant's "PC Cleaner" utility software was a good under the U.C.C.).

Thus, because Defendants do not and cannot seriously contend that this case involves the transfer of any rights to the intellectual property underlying its software, the software at issue is

properly considered a good and the Massachusetts U.C.C. applies.[13]

2. *Even if the Court considers the EULA, its disclaimer is at odds with Defendants' express representations and thus, is inoperative.*

Setting aside that the EULA is not properly before the Court, even if considered, Plaintiff sufficiently alleges the existence of express warranties Defendants made regarding PC TuneUp, which cannot be disclaimed. Under Massachusetts law, "creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other" and "negation or limitation is inoperative to the extent that such construction is unreasonable." G.L. c. 106, § 2-316 (1) (emphasis added).[14] Courts agree that express warranties by description cannot be disclaimed because they constitute the basis of the bargain. *Guckenberger v. Boston Univ*., 974 F. Supp. 106, 150 (D. Mass. 1997); *see also Russell v. Salve Regina College,* 890 F.2d 484, 488 (1st Cir. 1989), *rev'd on other grounds,* 499 U.S. 225 (1991), *and reinstated on remand,* 938 F.2d 315 (1st Cir. 1991) (looking at "various catalogs, manuals, handbooks, etc." to determine the terms of a contractual agreement); *see also* G.L. c. 106, § 2-313(1)(a) ("any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.").

In this case, the supposed disclaimer of all warranties found in the AVG EULA is completely at odds with the representations in Defendants' advertising materials, on their website, and in the software itself. *See, e.g., Hannon v. Original Gunite Aquatech Pools, Inc.,* 385 Mass. 813, 822 (1982) (holding that "express warranties can be created by an advertising

---

[13] In all relevant respects, the same holds true under both Delaware's and Minnesota's U.C.C. (which contain the same definitions and descriptions under Article 2).

[14] The Delaware and Minnesota U.C.C. contain the exact same provision. *See* Del. Code tit. 6, § 2-316 ("Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2-202) negation or limitation is inoperative to the extent that such construction is unreasonable."); *see also* Minn. Stat. § 336.2-316 (same).

brochure”). From there, and given the software’s actual functionality, it is not difficult to put together a breach of express warranty claim.

Under Massachusetts law, express warranties arise by “[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description….” *Stuto v. Corning Glass Works*, No. CIV. A. 88-1150-WF, 1990 WL 105615 (D. Mass. July 23, 1990) (quoting G.L. c. § 306 2-313). Here, Plaintiff alleges that Defendants advertised and represented that PC Tuneup would identify, report and repair a wide range of system errors, privacy and security threats, and other computer problems. (FAC ¶¶ 21-25, 45.) These representations are the exact terms of the warranty that Plaintiff reasonably relied upon when deciding to purchase the full version of PC Tuneup. (FAC ¶ 49.) However, despite Defendants’ express representations, the software does not accurately identify and report the actual condition of a user’s computer or otherwise perform the functions as represented. (*Id.* ¶ 48.) Defendants’ failure to provide software that functioned as expressly represented and promised constitutes the breach of warranty that ultimately caused Plaintiff’s injury (in the form of money paid for software that did not perform as advertised). Accordingly, Plaintiff has adequately and specifically pled his claim for breach of express warranties.

Further, Defendants’ disclaimer of warranties is inoperable in the face of Defendants’ express warranties (including the express representations made in its product advertising materials). Massachusetts law requires that express warranties and disclaimer language be “construed ... as consistent with each other” and “negation or limitation is inoperative to the extent that such construction is unreasonable.” G.L. c. 106, § 2-316(1)*; see also USM Corp. v. Arthur D. Little Sys., Inc.*, 28 Mass. App. Ct. 108, 121-22 (1989) (“To the extent that the express warranties are inconsistent with the disclaimer, however, G.L. c. 106, § 2-316(1), requires that

the express warranties be given effect.”). Here, Defendants’ disclaimer of express warranties is completely inconsistent with the express representations made through its marketing and advertising materials, and thus, is inoperable. Moreover, Plaintiff has adequately pled the elements of his claim. Accordingly, the Court should refuse to dismiss Plaintiff’s claim for breach of express warranty.

*3. Defendants cannot disclaim the implied warranty of merchantability either.*

Defendants’ argument that they have sufficiently disclaimed the implied warranty of merchantability is similarly unavailing. (AVG CZ Mot. 6-7.) Under Massachusetts law, “any language by which a manufacturer of consumer goods seeks to exclude or modify an implied warranty of merchantability or of fitness for a particular purpose, or to limit the consumer's remedies for breach of those warranties, is unenforceable.” G.L. c. 106, § 2-316A. Lack of privity between plaintiff and the defendant is no defense. G.L. c. 106, § 2-318; *see also Jacobs v. Yamaha Motor Corp., U.S.A.*, 420 Mass. 323, 327-31 (1995) (holding the fact that § 2-318 was initially enacted with a focus on personal injuries “should not inhibit the independent development of the law concerning warranties extended to the buyer of defective goods…We respond to this special legislative treatment by implementing the purposes of § 2-316A and § 2-318 and recognizing the right of a buyer of consumer goods to sue the manufacturer directly for a breach of an implied warranty of merchantability.”); *Cigna Ins. Co.*, 241 F.3d at 15 (“Actions under Massachusetts law for breach of the implied warranty of merchantability are the functional equivalent of strict liability in other jurisdictions, and they are as comprehensive as the strict liability provision in section 402A of the Restatement (Second) of Torts.”). Thus, Defendants’ alleged disclaimer is not legally enforceable, and fails to support dismissal of Plaintiff’s claim.

Rather, Plaintiff has adequately pled all of the required elements for his breach of implied warranty claim. To maintain a cause of action for breach of an implied warranty of merchantability, a consumer must plead: (1) that the good was not reasonably suitable for the ordinary uses for which goods of that kind and description are sold; (2) that defect or breach existed at the time of sale, and (3) that such defect or breach proximately caused the damages complained of. *Walsh v. Atamian Motors, Inc.*, 10 Mass. App. Ct. 828 (1980); *Rule v. Fort Dodge Animal Hosp., Inc.*, 604 F. Supp. 2d 288, 293-94 (D. Mass. 2009) *aff'd sub nom. Rule v. Fort Dodge Animal Health, Inc.,* 607 F.3d 250 (1st Cir. 2010) (holding that a seller breaches the implied warranty of merchantability "when a product that is 'defective and unreasonably dangerous' for the '[o]rdinary purposes' for which it is 'fit' causes injury.") (internal citations and quotations omitted).

Here, Plaintiff has pled that the PC Tuneup product he purchased was not reasonably suited for the ordinary purpose that Defendants represented and for which it was sold (namely, the accurate scanning and protection of his computer). As Defendants purposefully designed and manufactured PC Tuneup to behave in a deceptive manner (by falsely representing the health of a consumer's computer and inadequately performing its advertised functions), the defect existed at the time of sale. Further, Plaintiff has shown that Defendants' breach proximately caused the damages complained of, resulting in his overpayment for a product that does not function as represented and did not provide the promised benefit of the bargain.

As Defendants cannot disclaim the implied warranty of merchantability—and Plaintiff has adequately pled the elements of his claim—this count should stand as well.

*4. Plaintiff's contract-based claims clearly identify the terms of the contract*

*and Defendants' breach.*

Defendants argue further that Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing claims should be dismissed as well for two reasons. First, Defendants contend that Plaintiff fails to assert which contractual provisions were breached and how. (AVG CZ Mot. 11.) Second, Defendants argue that Plaintiff improperly tries to "rewrite the warranty provision of the contract that expressly governs" and "find[] additional terms to be implied through the covenant of good faith and fair dealing." (AVG CZ Mot. 12.) Defendants are, once again, mistaken.

a. Plaintiff adequately pleads all of the elements of his claim for breach of contract.

To state a claim for breach of contract under Massachusetts law, Plaintiff was required to (and did) allege: 1) the existence of a valid and binding contract, 2) that the defendant breached the terms of the contract, and 3) the plaintiff has suffered damages from the breach. *Aspect Software, Inc.,* 787 F. Supp. 2d at 127-28 (citing *Coll v. PB Diagnostic Sys., Inc.,* 50 F.3d 1115, 1122 (1st Cir. 1995) (applying Massachusetts law)).

Here, Theis alleges the existence of a valid sales contract (not the EULA) whereby Defendants agreed to sell, and he and the putative Class agreed to purchase, software that would accurately identify, report and repair legitimate computer errors and problems found on, and improve the overall performance of Plaintiff's and the Class's PCs (the "contract" and the breached "provisions"). (*See* FAC ¶ 92.) Plaintiff also alleges that he and the Class paid, and Defendants accepted, the purchase price of the software ("performance") (*Id.* ¶ 93), that Defendants failed to provide software that performed the agreed-upon functions ("breach") (*Id.* ¶ 94), and damages resulting from the breach—i.e., the amounts Plaintiff and the Class members overpaid for the software. (*Id.* ¶ 95.) Plaintiff thus adequately pleads the elements of his breach

of contract claim.[15]

b. Plaintiff also adequately alleges Defendants' breach of the implied covenant of good faith and fair dealing.

Additionally, Plaintiff properly alleges that implicit in his contract with Defendants were provisions that prevented them from engaging in conduct that frustrated or injured Plaintiff's and the Class's rights to receive the benefits of the contract, and obligated Defendants to fully comply with applicable statutory law, including Mass. Gen. Laws ch. 106 §§ 2-313 and 2-314. (FAC ¶¶ 101-102.) Contrary to Defendants' assertions, they've breached that covenant.

Under Massachusetts law, a breach of the implied covenant of good faith and fair dealing occurs when one party acts in such a way as to deprive the other party of the "intended fruits of the contract." *See Linton v. New York Life Ins. & Annuity Corp.*, 392 F. Supp. 2d 39, 42 (D. Mass. 2005); *McAdams v. Massachusetts Mut. Life Ins. Co.*, 391 F.3d 287, 301 (1st Cir. 2004) (The covenant operates "to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance."). That is precisely what happened here. Defendants abused their discretion by intentionally designing PC TuneUp so that it would not honestly and accurately detect, report and repair legitimate errors and threats on consumers' computers. Defendants' behavior deprived Plaintiff of receiving the "intended fruits of the contract" (software that performs as bargained for and represented) and frustrated its purpose. (FAC ¶¶ 103-104.)[9] As a result, the Court should find that Plaintiff has adequately stated his

---

[15] The same analysis would apply under Delaware and Minnesota law. *See H-M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 140 (Del. Ch. 2003) ("Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."); *see also Thomas B. Olson & Associates, P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 918 (Minn. Ct. App. 2008) ("A claim of breach of contract requires proof of three elements: (1) the formation of a contract, (2) the performance of conditions precedent by the plaintiff, and (3) the breach of the contract by the defendant.").

[9] Delaware and Minnesota law on the implied covenant of good faith and fair dealing is largely the same. *See Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) ("[T]he implied covenant requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits" of the bargain. Thus, parties are liable for breaching the

claims for breach of contract and breach of the implied covenant of good faith and fair dealing.[16]

**F. Plaintiff's Claim for Unjust Enrichment is Properly Pled In the Alternative to His Contract-Based Claims.**

Finally, Plaintiff has sufficiently pled his alternative claim for unjust enrichment as well. To maintain a claim for unjust enrichment under Massachusetts law, a plaintiff must allege that (1) a benefit was conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value. *See Stevens v. Thacker,* 550 F. Supp. 2d 161, 165 (D. Mass. 2008); *see also Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 412 F.3d 215, 234 n. 7 (1st Cir. 2005) ("unjust enrichment of one party and unjust detriment to another party."). Massachusetts courts further emphasize the importance of equitable concerns in a finding of unjust enrichment. *See Salamon v. Terra*, 394 Mass. 857 (1985) ("[C]onsiderations of equity and morality play a large part in constructing a quasi contract.").

Here, Plaintiff has pled his claim for unjust enrichment in the alternative to his contract-based claims, stating that "if the Court finds Plaintiff's and the Class's contracts with AVG invalid or unenforceable, Plaintiff and the members of the Class may be left without any adequate remedy at law." (FAC ¶ 108.) Moreover, Plaintiff sufficiently pleads the required elements of his unjust enrichment claim—that he and the Class conferred a benefit upon the AVG Defendants in the form of their overpayment for the purchase the full version of PC

---

covenant when their conduct frustrates the "overarching purpose" of the contract by taking advantage of their position to control implementation of the agreement's terms."); *see also Cox v. Mortgage Elec. Registration Sys., Inc.*, 685 F.3d 663, 671 (8th Cir. 2012) (citing *Team Nursing Servs., Inc. v. Evangelical Lutheran Good Samaritan Soc'y,* 433 F.3d 637, 641–42 (8th Cir. 2006) ("the implied covenant of good faith and fair dealing governs the parties' performance and prohibits a party from failing to perform for the purpose of thwarting the other party's rights under the contract.").

[16] Defendants' contention that Plaintiff is attempting to "rewrite" the warranty provision of the governing contract—the EULA—is unavailing inasmuch as the EULA may not be considered here.

TuneUp, that AVG knowingly received and retained those benefits, and that under the circumstances (where AVG provided them software that it knew was unable to perform as represented) it would be inequitable for them to retain those benefits. (*Id.* ¶¶ 108-113.) Nothing more need be pleaded and this claim should survive as well.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Dale Theis, individually and on behalf of all other similarly situated individuals, respectfully requests that the Court enter an Order (i) denying Defendant AVG US's and Defendant AVG CZ's motions to dismiss in their entirety, (ii) requiring the AVG Defendants to answer Plaintiff's First Amended Class Action Complaint, and (iii) providing such other and further relief as the Court deems equitable and just.

Respectfully submitted,

**DALE THEIS**, individually and on behalf of all others similarly situated,

Dated: October 31, 2012

By: /s/ Benjamin H. Richman
One of Plaintiff's Attorneys

JAY EDELSON (*Pro Hac Vice*)
jedelson@edelson.com
RAFEY S. BALABANIAN (*Pro Hac Vice*)
rbalabanian@edelson.com
BENJAMIN H. RICHMAN (*Pro Hac Vice*)
brichman@edelson.com
CHANDLER R. GIVENS (*Pro Hac Vice*)
cgivens@edelson.com
EDELSON MCGUIRE, LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370

David Pastor (BBO# 391000)
dpastor@pastorlawoffice.com
PASTOR LAW OFFICE, LLP
63 Atlantic Avenue, Third Floor
Boston, Massachusetts 02110
Tel: 617.742.9700

**CERTIFICATE OF SERVICE**

I, Benjamin H. Richman, an attorney, hereby certify that on October 31, 2012, I served the above and foregoing ***Plaintiff's Opposition to the AVG Defendants' Motions to Dismiss Amended Complaint***, by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system, on this the 31st day of October 2012.

/s/ Benjamin H. Richman
Benjamin H. Richman