UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHRISTOPHER ROTTNER, individually and :
on behalf of all others similarly situated,

                                        :

                      Plaintiff,            Civil Action
                                        :   No. 12-10920-RGS

          v.                             :

AVG TECHNOLOGIES CZ, S.R.O., a Czech
company, and AUSLOGICS SOFTWARE      :
PTY. LTD., an Australian company,

                                        :

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF
FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND
AWARD OF ATTORNEYS' FEES AND INCENTIVE AWARD**

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    SUMMARY OF THE LITIGATION AND SETTLEMENT EFFORTS...........................3

     A.    Plaintiff's Factual Investigation and the Allegations................................3

     B.    The Litigation History................................................................................4

     C.    Mediation and Settlement. ........................................................................7

III.   TERMS OF THE SETTLEMENT..............................................................................8

     A.    Settlement Fund ........................................................................................8

          1.    *Monetary Relief to Class Members*..............................................8

          2.    *Notice and Administrative Expenses*...........................................8

          3.    *Compensation for the Class Representative* ...............................8

          4.    *Attorneys' Fees and Expenses* ...................................................9

          5.    *Cy Pres* .......................................................................................9

     B.    In-Kind and Prospective Relief ................................................................9

          1.    *In-Kind Relief (Free Anti-Virus Software)* ...............................9

          2.    *Prospective Relief (Challenged Conduct Ceased)* ...................10

     C.    Release ...................................................................................................10

IV.   THE COURT SHOULD CONFIRM CERTIFICATION OF THE SETTLEMENT
     CLASS ...............................................................................................................10

     A.    The Settlement Class is Sufficiently Numerous. ....................................11

     B.    The Settlement Class Members Share Common Issues of Law and Fact.............11

     C.    Rottner's Claims are Typical of Those of the Settlement Class ............12

     D.    Rottner and Class Counsel Adequately Represent the Settlement Class..............12

     E.    The Settlement Class Meets Rule 23(b)(3)'s Requirements...................13

          1.    *Common Questions of Law and Fact Predominate* ...................13

| | 2. | *A Class Action is the Superior Method for Adjudicating this Controversy* | 14 |
|---|---|---|---|
| V. | | CLASS MEMBERS HAVE BEEN PROVIDED SUFFICIENT NOTICE OF THE ACTION AND THE SETTLEMENT AGREEMENT | 15 |
| VI. | | THE SETTLEMENT IS FAIR, REASONABLE, ADEQUATE, AND DESERVING OF FINAL APPROVAL | 17 |
| | A. | The Settlement is the Result of Arm's-Length Negotiations Through Mediation Between the Parties After Sufficient Discovery | 19 |
| | B. | The Settlement Satisfies Each of the Relevant *Grinnell* Factors | 20 |
| | 1. | *The Complexity, Expense and Likely Duration of the Litigation* | 20 |
| | 2. | *The Reaction of the Class to the Settlement* | 21 |
| | 3. | *The Stage of Proceedings and the Amount of Discovery Completed* | 23 |
| | 4. | *The Risks of Establishing Liability and Damages.* | 24 |
| | 5. | *The Ability of Defendants to Withstand a Greater Judgment* | 25 |
| | 6. | *The Amount of the Settlement Fund in Contrast to the Best Possible Recovery* | 25 |
| VII. | | THE PROPOSED *CY PRES* RECIPIENTS SHOULD BE APPROVED | 27 |
| VIII. | | THE REQUESTED ATTORNEYS' FEES AND EXPENSES ARE REASONABLE. | 30 |
| | A. | The Requested Attorneys' Fee Award is Reasonable Under the POF Method. | 31 |
| | 1. | *Size of the Fund and Number of Persons Benefitted* | 31 |
| | 2. | *Skill, Experience, and Efficiency of Counsel.* | 32 |
| | 3. | *Complexity and Duration of Litigation* | 33 |
| | 4. | *Risks of Litigation* | 34 |
| | 5. | *Amount of Time Devoted to the Case by Class Counsel* | 35 |
| | 6. | *Awards in Similar Cases* | 36 |
| | 7. | *Public Policy Considerations* | 37 |
| | B. | The Requested Attorneys' Fee Award is also Reasonable Under the Lodestar Approach | 38 |

IX.    THE COURT SHOULD APPROVE THE AGREED-UPON INCENTIVE
       AWARD ...................................................................................................................................40

X.     CONCLUSION...........................................................................................................................41

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .......................................................... 10, 40

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ...................................................................................... 30

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)............................................ 15

*Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414 (1968).............................. 26

*Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939) .................................................................... 31

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) .............................................................. 12

**United States Court of Appeals Cases**

*Andrews v. Bechtel Power Corp.*, 780 F.2d 124 (1st Cir. 1985) ................................................... 12

*Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44 (1st Cir. 2010) ............................. 15

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).................................................... 18

*City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041 (1st Cir. 1996).......................... 19

*Garcia-Rubiera v. Fortuno*, 727 F.3d 102 (1st Cir. 2013) .......................................................... 31

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
     55 F.3d 768 (3d Cir. 1995)................................................................................................ 26

*In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21 (1st Cir. 2012) .................................. 28

*In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24 (1st Cir. 2009) ............... 28, 29

*In re Thirteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig.*,
     56 F.3d 295 (1st Cir. 1995)........................................................................................... 30, 38

*In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4 (1st Cir. 2012)....................... 31

*Jurvis v. Inamed Corp.*, 685 F.3d 1294 (11th Cir. 2012)............................................................. 15

*Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*,
     582 F.3d 30 (1st Cir. 2009)........................................................................................... 17, 18

*Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32 (1st Cir. 2003) ......................................... 13, 14

*Wal-Mart Stores, Inc*. *v. Visa U.S.A., Inc*., 396 F.3d 96 (2d Cir. 2005) ...................................... 20

*Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518 (1st Cir. 1991) ....................................... 37

*Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741 (11th Cir. 1986) ...................................... 35

**United States District Court Cases**

*Aramburu v. Healthcare Fin. Servs., Inc.*,
    No. 02–cv–6535, 2009 WL 1086938 (E.D.N.Y. Apr. 22, 2009) ......................................... 25

*Brenner v. J.C. Penney Co.*,
    No. 13-cv-11212, 2013 WL 6865667 (D. Mass. Dec. 26, 2013)..................................... 31

*Domonoske v. Bank of Am., N.A.*,
    790 F. Supp. 2d 466 (W.D. Va. 2011) ............................................................................... 22

*Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54 (D. Mass. 1997) .......................... 24

*Giusti-Bravo v. U.S. Veterans Admin.*, 853 F. Supp. 34 (D.P.R. 1993) ..................................... 22

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    216 F.R.D. 197 (D. Maine 2003) ...................................................................................... 16

*In re Lupron Mktg. & Sales Pracs. Litig.*,
    No. 01-cv-10861, 2005 WL 2006833 (D. Mass. Aug. 17, 2005) ............................. *passim*

*In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005) ..................... *passim*

*In re M3 Power Razor Sys. Mktg. & Sale Practice Litig.*, 270 F.R.D. 45 (D. Mass. 2010) ........ 24

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    No. 05–MD–1720 (JG)(JO), 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013)................... 20

*In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) ................................................ *passim*

*In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672 (S.D. Fla. 2004)........................... 12

*In re TJX Cos. Retail Sales Sec. Breach Litig.*, 584 F. Supp. 2d 395 (D. Mass. 2008) .......... 39, 40

*In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007)............................ 40

*In re Wachovia Equity Sec. Litig.*,
    No. 08-cv-6172, 2012 WL 2774969 (S.D.N.Y. June 12, 2012) ...................................... 22

*Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001)................................................. 20

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) .............................. 21, 23, 24

*Mann & Co., PC v. C-Tech Indus., Inc.*,
No. 08-cv-11312, 2010 WL 457572 (D. Mass. Feb. 5, 2010) ......................................... 35

*McAdams v. Mass. Mut. Life Ins. Co.*,
No. 99-cv-30284, 2002 WL 1067449 (D. Mass. May 15, 2002) ...................................... 11

*Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360 (S.D. Fla. 2007) ................................... 23

*Rolland v. Cellucci*, 191 F.R.D. 3 (D. Mass 2000) .............................................. 20, 23

*Trombley v. Bank of Am. Corp.*,
No. 08-CV-456-JD, 2013 WL 5153503 (D.R.I. Sept. 12, 2013) ..................................... 31

*Wehlage v. Evergreen at Arvin LLC*,
No. 10–cv–05839, 2012 WL 2568151 (N.D. Cal. June 25, 2012) ..................................... 25

## Statutes and Federal Rules

28 U.S.C. § 1715 ......................................................................................... 17

Fed. R. Civ. P. 23 ......................................................................... 10, 11, 15, 17

## Other Authorities

Alba Conte & Herbert Newberg,
Newberg on Class Actions § 14:6 (4th ed.) ............................................... 37, 40

Am. Law Inst.,
Principles of the Law of Aggregate Litigation § 3.07 ...................................... 28

Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain
Language Guide* (2010),
http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf ................ 16

George B. Hornstein, *Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards*,
69 Harv. L. Rev. 658 (1956) ................................................................. 36

# I. INTRODUCTION

Plaintiff Christopher Rottner ("Plaintiff" or "Rottner"), by and through Class Counsel, respectfully moves this Court pursuant to Federal Rule of Civil Procedure 23 for an order (1) confirming certification of the Settlement Class, the appointment of Class Counsel, and the appointment of the Class Representative; (2) granting final approval of the Parties' Stipulation of Class Action Settlement ("Settlement"); (3) approving the proposed *cy pres* recipients; and (4) approving the agreed-upon attorneys' fees and incentive awards from the Settlement Fund.[1]

Through mediation with Professor Eric Green, Rottner was able to reach a settlement with Defendants AVG Technologies CZ, s.r.o. ("AVG" or "AVG CZ") and Auslogics Software Pty. Ltd. ("Auslogics") (collectively the "Defendants") resolving his breach of contract and breach of warranty claims related to the alleged fraudulent design and marketing of AVG's PC TuneUp Software ("PC TuneUp" or "Software"). On December 17, 2013, this Court conditionally certified the Settlement Class, granted preliminary approval to the settlement, and approved the Notice Plan as fully compliant with Due Process and the best notice practicable under the circumstances. (*See* Preliminary Approval Order, Dkt. 100, a copy of which is attached as Exhibit 2.) The Settlement Administrator has successfully implemented the Notice Plan and the time for filing objections or requesting to be excluded has now passed. The reaction to the settlement has been overwhelmingly positive: only two Class Members have submitted comments[2] and just twelve have requested to be excluded from the settlement.[3]

---

[1]    Unless otherwise stated herein, capitalized terms shall have the same meaning as set forth in the Parties' Stipulation of Class Action Settlement, attached as Exhibit 1.

[2]    As explained further in Section VI.B.2 below, neither of the two Settlement Class Members submitting comments styled "objections" opposed any specific portion of the Parties' settlement or addressed its substantive terms. Instead, one commentor appears to be asserting supposed copyright infringement claims against Defendants, while the other raises a philosphical objection to class action litigation in general. In any event, neither of these "objections" should stand as a basis to deny final approval of the settlement.

This favorable reaction is of little surprise given the settlement represents a significant recovery for the Settlement Class and, if approved, will provide those Class Members submitting Approved Claims with more than full compensation for the amounts each overpaid for the Software, as well as valuable in-kind relief to all members of the Class. After the Court granted preliminary approval, Defendants tendered $2.5 million into a non-reversionary cash "Settlement Fund." Each Class Member was afforded the opportunity to submit a claim for a set cash payment of $15.00 for each Software license they purchased, which could be increased up to the full purchase price they paid if monies remained in the Settlement Fund after payment of the costs of notice and administration, an incentive award to Rottner as Class Representative, and an award of reasonable attorneys' fees and expenses to Class Counsel. If any funds remain after such a redistribution, they will be distributed to Court-approved *cy pres* recipients.

Finally, Defendants have also agreed to provide each of the more than three hundred fifty thousand Settlement Class Members four months of free access to AVG's AntiVirus software, regardless of whether they submit a claim under the Settlement. At a cost of $39.99 per year for the paid version of this software, this in-kind component of the settlement represents more than $13 in additional relief to each Settlement Class Member, and more than $4.7 million for the Settlement Class as a whole.

For these reasons and as described further below, Rottner respectfully requests that this Court find the Settlement to be fair, reasonable and adequate, and grant it final approval.

---

*(cont'd from previous page)*

[3]     As of the date of filing there have been 8,860 claims submitted, but the Claims Deadline of April 14, 2014 has not yet passed. Accordingly, Class Counsel will be able to update the Court at the Final Approval hearing as to the total number of claims filed, the estimated amount of payment to be made to each Class Member, and the estimated amounts remaining in the Settlement Fund that will be directed to the *cy pres* candidates, subject to Court approval.

**II.    SUMMARY OF THE LITIGATION AND SETTLEMENT EFFORTS.**

**A.    Plaintiff's Factual Investigation and the Allegations.**

Prior to filing the initial complaint in this case on May 22, 2012, Class Counsel began receiving and investigating consumer complaints about the PC TuneUp Software and other similar software products. (*See* Declaration of Benjamin H. Richman ("Richman Decl.") ¶ 3, a copy of which is attached as Exhibit 3.) This investigation focused on allegations that these programs inaccurately claimed to be able to identify and repair a wide range of PC system errors, remove privacy and security threats, and boost computer speed, along with other similar representations. (*Id.*) As Plaintiff Rottner's operative Second Amended Complaint (the material allegations in and of which Defendants deny) alleges, in order to corroborate this anecdotal evidence provided by consumers (including, but not limited to, former plaintiff Dale Theis and Class Representative Rottner), Class Counsel employed the services of a computer forensic expert to examine PC TuneUp's functionality. (Dkt. 1 ¶ 23; Dkt. 53 ¶ 37.) Rottner further alleges that the results of the expert's examination—which Defendants have at all times refuted—were consistent with consumers' experiences with the Software. (Dkt. 1 ¶¶ 23-24; Dkt. 53 ¶ 39.)

Based on Plaintiff's individual experience and Class Counsel's investigation into the functionality of the Software, Rottner's operative Second Amended Complaint also alleged that PC TuneUp was marketed (through its websites, online marketing materials, and product packaging) as being capable of accurately identifying, reporting, and repairing a wide range of computer errors, security threats, and other problems, as well as to increase the speed, performance, and stability of a user's PC, (Dkt. 53 ¶¶ 21, 23), but designed to function differently. Specifically, Plaintiff alleged that Defendants offered consumers a 24-hour trial version of PC TuneUp that would perform a free diagnostic "scan" to detect issues and other problems existing on their computers. (*Id.* ¶¶ 32–33.) Plaintiff further alleged that the free scan

invariably reported the existence of numerous errors and other problems on the computer—often characterized as "severe"—that are not actually threats to the computer. (*Id.* ¶¶ 33-34, 37.) Rottner alleges that the Software then announced that the purported "severe errors" could be "fixed" if the consumer purchased a $35 license for the full version of the Software and ran weekly scans to identify and eliminate threats going forward. (*Id.* ¶¶ 34–36.) According to Rottner's allegations, once purchased, the full version of the Software operated in a nearly identical manner, lulling the consumer into a false sense of security that it functions as advertised (by "identifying" and then "fixing" supposed errors).[4] (*Id.* ¶ 38.) Defendants have at all times denied Plaintiff's allegations.

### B. The Litigation History.

Following the filing of the original complaint and Motion for Class Certification,[5] counsel for AVG US and Class Counsel agreed to meet in Boston on July 11, 2012 to informally discuss the case and for Class Counsel to present the results of their investigation into PC TuneUp. (Richman Decl. ¶ 4.) While worthwhile, at the conclusion of the meeting it was clear that certain issues would need to be clarified through litigation before further progress toward any resolution could be made. (*Id.*)

On August 15, 2012, AVG US moved to dismiss the original complaint, arguing that it was not a proper party and claiming that, in fact, its European affiliate, AVG CZ, had a relevant role with respect to the AVG PC TuneUp Software at issue. (Dkts. 20, 21.) AVG US also provided Plaintiff's counsel with confirmatory information in that regard. Former plaintiff Theis

---

[4]     Based on these allegations, Plaintiff brought claims against Defendants and AVG U.S. for Breach of Express Warranty, Breach of Implied Warranty of Merchantability, Fraudulent Inducement, Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, and Unjust Enrichment. (Dkt. 53.)

[5]     The Motion for Class Certification, (Dkts. 2-3), was ordered to be briefed at a later time following discovery. (*See* Dkts. 22, 34.)

subsequently filed his first amended complaint, adding Defendants AVG CZ and Auslogics, which Theis learned had designed the AVG PC TuneUp Software at issue. (Richman Decl. ¶ 5; Dkt. 25.)

AVG US and AVG CZ then separately moved to dismiss the first amended complaint. (Dkts. 35-38.) AVG US argued that it should be dismissed because it did not develop, market, or sell the PC TuneUp Software. (Dkts. 37-38.) AVG CZ urged dismissal on the grounds that plaintiff failed to state a claim under Delaware law, which it asserted applied to the claims rather than Massachusetts law. (*Id.*) After briefing on both motions (*see* Dkts. 35-38, 44, 50-51), the Court converted the motions to dismiss into motions for partial summary judgment on the question of whether PC TuneUp's End User License Agreement required the application of Delaware law and whether a Delaware court was the proper forum for adjudicating the matter. (Dec. 18, 2012 Order.) The Parties then agreed to stipulate to the substitution of Rottner as the named-plaintiff and to proceed with the case in the District of Massachusetts. (Feb. 20, 2013 Order; Dkt. 53.)

After Rottner filed his Second Amended Complaint, the AVG Defendants re-filed their motions to dismiss. (Dkts. 53, 54-57.) AVG US renewed its arguments that it was improperly named as a party-defendant, while AVG CZ argued, *inter alia*, that the Software was not a good as defined by the Uniform Commercial Code (UCC) and thus, Rottner's breach of warranty claims were inapplicable. (Dkts. 54-57.) AVG CZ also argued that Rottner had failed to plead his fraud claims with the requisite particularity. (Dkts. 56-57.) Both AVG Defendants asserted that Delaware, not Massachusetts, law should control. (Dkts. 54-57.) After full briefing on both motions (Dkts. 61, 66-67), the Court heard oral argument on April 30, 2013.

While the parties were engaged in the amendment of and briefing on the pleadings, Class Counsel began the task of attempting service on Auslogics in Australia under the terms of the

Hague Convention, which turned out to be a significant undertaking. (Dkt. 83.) First, Class Counsel had Australian authorities attempt to serve Auslogics at its advertised business address, but that attempt failed because Auslogics uses a P.O. Box as its business address. Next, Class Counsel hired a private international process server to attempt service at Auslogics's corporate headquarters in Sydney. This, too, failed because the process server was denied access to the office. Class Counsel's attempt to mail the operative pleadings to Auslogics's registered address faired no better, as Auslogics's representatives refused to accept service. Finally—and as a last resort—Class Counsel e-mailed the documents to the company's director and its in-house legal department, confirmed the email was opened, and moved the Court to deem its service efforts effective. (Dkt. 83 at 1-2.) The Court granted the request and ordered Auslogics to appear. (Dkt. 84.)

Concurrent with the motion practice and quest to effectuate service on Auslogics, the Parties proceeded with discovery. (Richman Decl. ¶ 6.) AVG CZ served interrogatories, document requests, and requests for inspection on Theis, while Theis issued his own written discovery requests, including written interrogatories and requests for the production of documents and electronic information on both AVG defendants. (*Id*.) In response to Theis's discovery requests, AVG CZ produced information and both AVG defendants committed to produce various categories of documents, but also asserted both general and specific objections to Plaintiff's 30 interrogatories and 190 document requests. (*Id*.) AVG CZ ultimately produced— after several rounds of meet and confers—tens of thousands of documents and emails for review. (*Id*.) Upon receipt, Class Counsel reviewed and analyzed the production, which ultimately supported their theory of the case. (*Id.*)

On May 3, 2013 the Court granted in part and denied in part the AVG Defendants' motions to dismiss. (Dkt. 73.) Although the Court dismissed all claims against AVG US and held

that Delaware law applied, it agreed with Plaintiff's theories and allowed him to move forward

against AVG CZ and Auslogics, with the exception of one of his implied warranty claims. (*Id.*)

### C.     Mediation and Settlement.

After ruling on the Motion to Dismiss and with Defendants having made substantial

document production, the Parties agreed to again meet to discuss the potential of settlement.

(Richman Decl. ¶ 7.) This time, the Parties, including Auslogics, agreed to engage in a formal

mediation with ADR pioneer and renowned mediator Professor Eric D. Green of Resolutions,

LLC. (*Id.*) Prior to the mediation, the Parties provided Professor Green with detailed mediation

submissions outlining their views of the case. (*Id.*) Then on August 14, 2013, Class Counsel,

Defendants' Counsel, and Defendants' executives and software developers from Europe and

Australia all met in Boston with Professor Green for mediation. (*Id.*) While the Parties again

discussed their differing views of the law and the facts regarding the operation of PC TuneUp,

they ultimately turned to negotiating the parameters of a class-wide settlement. (*Id.*) At the end

of the day, they reached agreement upon a class-action settlement in principle on the

consideration to be paid by Defendants, and reached agreement on a framework for settlement,

subject to confirmation of funding, negotiation and execution of a mutually agreeable written

settlement containing all material terms. (*Id.*) In the months that followed, the Parties exchanged

numerous drafts of the settlement documents as they worked toward the final Settlement

Agreement now before the Court. (*Id.*)

On December 17, 2013, the Court granted preliminary approval, certifying the proposed

Settlement Class for settlement purposes, approving the Parties' proposed Notice Plan, and

setting the deadline for Class Members to object or request exclusion from the Settlement Class.

(Dkt. 100.)

# III. TERMS OF THE SETTLEMENT

The key terms of the Settlement, to which this Court granted Preliminary Approval, are set forth in full in the Agreement attached as Exhibit 1 and are briefly summarized as follows:

**A.    Settlement Fund:** After entry of Preliminary Approval, Defendants created a non-reversionary common fund by collectively depositing $2.5 million into an escrow account established and controlled by the Settlement Administrator. The Settlement Fund is to be distributed as follows:

**1.    *Monetary Relief to Class Members*:** Each Settlement Class Member that submits a valid Claim Form will receive a payment of $15.00 for each license they purchased to use the AVG PC TuneUp Software, to be paid from the Settlement Fund. (*Id.* § VI.A.2.) If, after payment of all valid claims (as well as all notice and administrative expenses, attorneys' fees, and an incentive award), any money remains in the Settlement Fund, that money will be evenly distributed to all Settlement Class Members who submitted claims, allowing each Class Member to receive up to $35, or the full purchase price of the Software. (*Id.*) Here, and as explained more fully below, based on the number of claims made, each claimant will indeed receive a full refund of their purchase price.

**2.    *Notice and Administrative Expenses*:** Defendants have agreed to pay all notice and administration expenses from the Settlement Fund. (*Id.* §§ II, VII.C.)

**3.    *Compensation for the Class Representative*:** Defendants agree not to object to a request by Plaintiff for an incentive award in the amount of $1,500 for his services as Class Representative. (*Id.* § XI.A.) The basis for Plaintiff's request is set forth below in Section IX.

**4.    *Attorneys' Fees and Expenses*:** Defendants agree not to object to a request for attorneys' fees and expenses in an amount up to one-third of the Settlement Fund. (*Id.*

§ XI.B.) As discussed below in Section XIII, Class Counsel seeks a total award of fees and expenses in the amount of $750,000, which represents 30% of the Settlement Fund, and less than 11.6% of the total settlement value (including in-kind relief).

**5.** ***Cy Pres***: If any money remains in the Settlement Fund following payment of Settlement Class Member claims (including the full $35 refunds), notice and administrative expenses, an incentive award, and attorneys' fees, that remaining money shall, subject to the Court approval sought below in Section VII, be shared equally between the National Consumer Law Center and the Stanford University Security Laboratory as *cy pres* recipients. On March 3, 2014, the Parties caused the Settlement Administrator to post the proposed *cy pres* recipients on the Settlement Website.

**B.**    **In-Kind and Prospective Relief:** In addition to the monetary relief described above, the Settlement Agreement also provides for significant in-kind and prospective relief.

**1.** ***In-Kind Relief (Free Anti-Virus Software)***: Each Settlement Class Member is entitled to receive four (4) months of free access to AVG's proprietary anti-virus software known as AVG AntiVirus. (Agreement § VI.A.3.) The functionality of AVG AntiVirus, which retails for $39.99 per year, is not in question. In addition, the Settlement provides that if a threshold number of Settlement Class Members do not redeem their free access, those who do will be given additional months of free access, up to twelve (12) months total. Here, as explained more fully below, based on the number of claims made, each claimant will indeed receive twelve (12) months of free access to AVG AntiVirus—for a value of $39.99 per Class Member.

**2.** ***Prospective Relief (Challenged Conduct Ceased)***: Defendants have ceased marketing, distributing, and selling the PC TuneUp Software at issue in this Action. (*Id*. § VI.C.)

**C.**    **Release:** In exchange for the relief described above, and upon entry of a final

order approving the Settlement, Defendants will be released from all claims arising out of or related to claims in this action, and the design, functionality, and marketing of the AVG PC TuneUp Software. (*Id.* § V.)

## IV. THE COURT SHOULD CONFIRM CERTIFICATION OF THE SETTLEMENT CLASS.

"Before this Court can determine whether the settlement is fair, it must finally certify the class." *In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 67 (D. Mass. 2005). In his Motion for Preliminary Approval (Dkt. 99), Rottner detailed the legal and factual bases justifying class certification pursuant to Federal Rule of Civil Procedure 23(b)(3), and the Court conditionally certified a Settlement Class consisting of "[a]ll individuals and entities in the United States and its territories who, between September 27, 2010 and September 6, 2012, inclusive, purchased from AVG a paid license to use the AVG PC TuneUp Software." (Dkt. 100 ¶ 3.) In support of final certification of the Settlement Class, Rottner incorporates by reference his arguments in his Motion for Preliminary Approval. (Dkt. 99.) For those reasons and the reasons set forth below, the Court should confirm certification of the Settlement Class.

To certify a class for any purpose, the proposed class must satisfy each of Rule 23(a)'s four prerequisites: numerosity, commonality, typicality, and adequacy of representation. *See* Fed. R. Civ. P. 23(a); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614-22 (1997). Because the Settlement Class was conditionally certified under Rule 23(b)(3), Plaintiff must also show that (i) the questions of law or fact common to Class Members predominate over any individual questions and (ii) that maintaining the lawsuit as a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3); *In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 87 (D. Mass. 2005). Here, the Settlement Class continues to meet—and exceed—these criteria.

## A. The Settlement Class is Sufficiently Numerous.

Rule 23(a)'s numerosity requirement that "the class is so numerous that joinder of all members is impractical," Fed. R. Civ. P. 23(a)(1), is easily satisfied, as discovery has indicated that a minimum of 355,958 persons purchased licenses to use the PC TuneUp Software.[6] (Morrison Decl. ¶ 8.) *McAdams v. Mass. Mut. Life Ins. Co.*, No. 99-cv-30284, 2002 WL 1067449, at *3 (D. Mass. May 15, 2002) *aff'd,* 391 F.3d 287 (1st Cir. 2004) (finding that classes of 40 or more members are sufficiently numerous for certification).

## B. The Settlement Class Members Share Common Issues of Law and Fact.

Commonality requires that "at least one common issue of fact or law at the core of the action must shape the class," but not that every class member "share every factual and legal predicate of the action." *In re Lupron*, 228 F.R.D. at 88. Here, members of the Settlement Class share a common set of legal claims that arise out of the same core facts, including, *inter alia*: whether Defendants (i) designed the PC TuneUp Software to invariably report errors and exaggerate threats to a user's computer, (ii) misrepresented the functional capabilities of the Software, and (iii) charged and collected from the Settlement Class inflated prices for the purchase of the Software licenses. Regardless of the answers, these questions commonly focus on Defendants' conduct, and commonality is satisfied. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (explaining that commonality is found where the claims of all class members "depend upon a common question," and "even a single common question will do").

---

[6]     Discovery and records provided by Defendants for purposes of notifying the Settlement Class have shown that approximately 440,000 licenses to use the PC TuneUp Software were purchased. When scrubbed for duplicate names and contact information, those records yield approximately 358,958 unique individuals that each purchased one or more licenses to the Software. (Declaration of Andy Morrison ("Morrison Decl.") ¶ 8, a copy of which is attached as Exhibit 4.)

**C.      Rottner's Claims are Typical of Those of the Settlement Class.**

Next, Rule 23(a)'s typicality requirement asks whether a plaintiff's claims are typical of those of the proposed class and requires the plaintiff to show that "[a] sufficient nexus is established [demonstrating that] the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *In re Lupron*, 228 F.R.D. at 89 (quoting *In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 686 (S.D. Fla. 2004)). Here, Rottner and the Settlement Class Members share the same legal claims premised upon the same (or substantially the same) set of facts—they all downloaded and used Defendants' PC TuneUp Software, the functionality of which Defendants allegedly misrepresented to induce them to purchase the full version. As a result of that conduct, Rottner and the Settlement Class were damaged in the exact same manner in the form of the monies they paid for the Software licenses. As such, typicality is satisfied.

**D.      Rottner and Class Counsel Adequately Represent the Settlement Class.**

Rule 23(a)(4) requires two things: Rottner must confirm his interests do not conflict with the interests of the Settlement Class, and Class Counsel must confirm they are qualified and experienced to represent the Settlement Class. *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985). Both are satisfied here.

First, Rottner and the Settlement Class all have an interest in recouping the monies they paid for the Software that allegedly failed to function as promised and in ensuring that Defendants do not continue their alleged misconduct into the future. Further, Rottner does not have any individual interests in this case (as evidenced through discovery) that would be antagonistic to those of the Settlement Class; indeed, his vigorous pursuit of this action demonstrates as much. (Richman Decl. ¶ 29.)

Second, Class Counsel have regularly engaged in major complex litigation involving

consumer technology issues—including the prosecution of numerous class actions related to the alleged fraudulent design and marketing of software products similar to those at issue here— have the resources necessary to conduct litigation of this nature, and have frequently been appointed lead class counsel by courts throughout the country.[7] (*Id.* ¶¶ 15–16; *see also* Firm Resume of Edelson PC, attached as Exhibit 3-A to the Richman Declaration.) Class Counsel have diligently investigated, prosecuted, and dedicated substantial resources to the claims in this Action, and they will continue to do so throughout its pendency. (Richman Decl. ¶¶ 17–18, 22.)

### E. The Settlement Class Meets Rule 23(b)(3)'s Requirements.

In addition to confirming that the Settlement Class satisfies the four Rule 23(a) prerequisites, the Court must also confirm pursuant to Rule 23(b)(3) that (i) questions of law and fact common to members of the Settlement Class predominate over questions affecting only individuals and (ii) the class action mechanism is superior to other available methods for the fair and efficient adjudication of the controversy. *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).

### 1. Common Questions of Law and Fact Predominate.

The predominance requirement is satisfied where a plaintiff demonstrates that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 28 (D. Mass. 2010) (quoting *Amchem*, 521 U.S. at 623). The test is "readily met" in consumer class actions where common issues regarding liability are paramount, even if some issues remain as to individual damages. *In re Lupron*, 228 F.R.D. at 91.

Here, there are core factual issues applicable to the Settlement Class as a whole that predominate over any individual issues. Because Defendants marketed and sold the Software to

---

[7]     For these same reasons, the Court should also confirm the appointment of Class Counsel pursuant to Rule 23(g)(1)(A).

Rottner and the Settlement Class in exactly the same manner, each of their causes of action will succeed or fail based on common proof regarding whether (i) Defendants designed the Software to exaggerate the existence and severity of errors and other problems on users' computers, (ii) Defendants intentionally created their marketing materials and in-software representations to misrepresent the Software's actual functional capabilities, and (iii) the Software did not and could not provide the computer repairs and enhancements advertised. These factual issues predominate over any issues affecting only individual members of the Settlement Class, such as the amount of damages each Settlement Class Member is entitled to recover. *See, e.g., Smilow*, 323 F.3d at 40 (finding that "[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3) . . . [w]here, as here, common questions predominate regarding liability…."). Accordingly, Rule 23(b)(3)'s predominance requirement remains satisfied.

## 2. *A Class Action is the Superior Method for Adjudicating this Controversy.*

Rule 23(b)(3) also requires the Court to confirm whether this class action is superior to other available methods for the fair and efficient adjudication of the Settlement Class's claims. This is almost always true where "few, if any, members of the settlement class have incurred damages in an amount sufficient to justify the costs of pursuing an individual action." *In re Lupron*, 228 F.R.D. at 92; *see also Smilow*, 323 F.3d at 42 ("[t]he core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation."). Here, the uniformity of claims and the small amount of individual damages ($35 or less) relative to the costs of litigating their claims clearly establish that a class action is by far the superior method of adjudicating this dispute. This is particularly true when the alternative is tens of thousands of individual suits—or no suits at all. *See In re Relafen Antitrust Litig.*, 221 F.R.D. at 287 (finding superiority satisfied where a class action ensures "vindication of the rights of groups of people who individually would be without effective strength to bring

their opponents into court at all."). As a result, this class action is the superior method for adjudicating this controversy.

*              *              *

Having established that the requirements of both Rule 23(a) and 23(b)(3) have been satisfied, Rottner respectfully requests that the Court confirm certification of the Settlement Class, his appointment as Class Representative, and the appointment of his counsel as Class Counsel.

## V. CLASS MEMBERS HAVE BEEN PROVIDED SUFFICIENT NOTICE OF THE ACTION AND THE SETTLEMENT AGREEMENT.

Following certification of a class under Rule 23(b)(3) and before the Court may enter final approval, class members must be provided "the best notice that is practicable under the circumstances" describing "the right of the class member to seek to appear by his own attorney or to opt out of the class and—if he fails to opt out—a warning that he or she will be bound by the judgment." *Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 50-51 (1st Cir. 2010) (citing Fed. R. Civ. P. 23(c)(2)(B)); Fed. R. Civ. P. 23(e)(1). Ultimately, the notice provided must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

Neither Rule 23 nor due process requires receipt of actual notice by all class members, *Jurvis v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir. 2012), and the Federal Judicial Center has suggested that a notice plan that reaches 70% of class members is reasonable.[8] Notice that provides "the basic elements of the case, the general terms of the proposed settlement, the legal rights of the affected customers, and the process for filing a claim . . . [and] also include[s] []

---

[8] *See* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* at 3 (2010), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf.

dedicated Internet and mailing addresses and a toll-free telephone number that consumers could call to obtain additional information" is sufficient to allow class members to make "an informed and intelligent" decision about their rights under a proposed settlement. *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 203-04 (D. Maine 2003).

Here, the Court approved the Parties' proposed Notice Plan, finding that it "complie[d] with the requirements of Rule 23 and due process, and constitute[d] the best notice practicable under the circumstances," and appointed KCC Class Action Services, LLC as Settlement Administrator.[9] (Dkt. 100 ¶¶ 7-8.) The Notice Plan called for direct notice to the Settlement Class via e-mail (the primary means by which Settlement Class Members communicated with Defendants) as well as publication of the Notice on the Settlement Website, (www.auslogicsavgsettlement.com) and also specified the content of the notices, which used simple, plain language to encourage readership and comprehension. (Agreement Ex. A; Dkt. 100 ¶ 8.)

KCC and the Parties diligently followed the Court-approved Notice Plan. First, Defendants provided to KCC electronic files containing the names, email addresses, and license numbers for 426,523 potential Settlement Class Members who purchased a license to PC TuneUp. (Morrison Decl. ¶ 7.) Accounting for duplicates and other consolidated records, KCC determined that there were 355,958 unique names and emails comprising the Settlement Class List. (Morrison Decl. ¶ 8.) KCC was able to successfully deliver the Court-approved notice via email on January 14, 2014 to 299,743 (84.21%) of the Settlement Class Members, (*id.* ¶¶ 11-12), and pursuant to the Court's March 3, 2014 Order, sent a second email notice to the 355,958 Settlement Class Members, 86.59% of which were successfully delivered. (*Id.* ¶¶ 14-15.)

---

[9]    KCC is an experienced class action notice and settlement administration firm with fourteen years of experience in over 1,500 cases where they have distributed over $2 billion in settlement payments. (Morrison Decl. ¶¶ 3-4.)

Also pursuant to the Court-approved Notice Plan, KCC created a case-specific website (www.auslogicsavgsettlement.com), which went live on January 7, 2014, and a toll-free number (855-298-0607) where Class Members could review, request and receive information about the settlement. (Morrison Decl. ¶¶ 9-10.) Specifically, the website contains various information about the settlement, including the Court-approved settlement Notice, the Settlement Agreement, various Court documents, answers to frequently asked questions, and contact information for the Settlement Administrator and Class Counsel. (*Id.*) Additionally, the Settlement Website provides members of the Class with the ability to electronically file claim forms or to download paper claim forms for submission by mail. (*Id.*)

Finally, in accordance with the Notice Plan and the Class Action Fairness Act, 28 U.S.C. § 1715, Defendants' counsel sent notice of the settlement to the United States Attorney General and the Attorneys General for all fifty states, the District of Columbia, and Puerto Rico. (Dkt. 109.)

## VI. THE SETTLEMENT IS FAIR, REASONABLE, ADEQUATE, AND DESERVING OF FINAL APPROVAL.

Under Rule 23, this Court may approve a class settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 44 (1st Cir. 2009). While proponents of a class action settlement have the burden of establishing its reasonableness, judicial policy encourages settlements. *Nat'l Ass'n of Chain Drug Stores*, 582 F.3d at 44 (internal citations omitted); *see also In re Relafen*, 231 F.R.D. at 68 (noting that, notwithstanding the necessary scrutiny inherent in the Rule 23 analysis, "the law favors class action settlements.").

The First Circuit has not adopted its own determinative set of factors to assess the fairness, reasonableness, and adequacy of a proposed settlement, but courts in this District commonly apply a full or modified version of a test set forth by the Second Circuit in *City of*

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *overruled on other grounds by Missouri v. Jenkins*, 491 U.S. 274 (1989). *See, e.g., In re Lupron*, 228 F.R.D. at 93-94; *Nat'l Ass'n of Chain Drug Stores*, 582 F.3d at 44.

In *In re Lupron*, this Court analyzed the following six factors from *Grinnell* in deciding whether to grant final approval to a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability and damages; (5) the ability of the defendants to withstand a greater judgment; and (6) the amount of the settlement fund in contrast to the best possible recovery.

*In re Lupron*, 228 F.R.D. at 93–98; *see also In re Relafen Antitrust Litig.*, 231 F.R.D. at 72 (adopting an identical test).[10]

In addition to the *Grinnell* factors, some courts examine whether the settlement was procured by collusion or whether it was instead the product of arm's-length negotiations informed by discovery. *See In re Lupron*, 228 F.R.D. at 93 (noting that "[w]hen sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of settlement") (citing *City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996)). Here, the Settlement Agreement easily passes both tests: it is free from collusion, having been the product of arm's-length negotiations after sufficient

---

[10]     The nine *Grinnell* factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Grinnell*, 495 F.2d at 463. As this Court concluded in *In re Lupron*—both explicitly and through its analysis—several of the factors overlap and can be analyzed together, while others related to manageability of the case at trial are not relevant in the settlement context. 228 F.R.D. at 95.

discovery between the Parties with the assistance of a neutral mediator, and it satisfies each of the relevant *Grinnell* reasonableness factors identified by the Court.

A. **The Settlement is the Result of Arm's-Length Negotiations Through Mediation Between the Parties After Sufficient Discovery.**

The context in which the Settlement Agreement was procured confirms that the settlement was the result of arm's-length and informed negotiations and is thus entitled to a presumption of fairness. At the outset of the litigation when the Parties met to discuss their views of the case, they mutually determined that discovery and motion practice into the proper parties and scope of the claims was required. (Richman Decl. ¶ 4.) It was only after extensive briefing, receiving a ruling on Defendants' Motion to Dismiss, and engaging in formal discovery— including the production and review of several thousands of pages of documents—that the Parties believed they had sufficient information to discuss a potential resolution of the case. The Parties subsequently agreed to mediation with Professor Eric D. Green of Resolutions, LLC. (*Id.* ¶ 7.) At the outset of the mediation, it was not even clear that a deal would be possible, as both sides argued over facts regarding the operation of the PC TuneUp Software. (*Id.*) But with the assistance of Professor Green, the Parties were ultimately able to agree on the principle terms of what, with further negotiations, would result in the instant settlement.

Because the Settlement Agreement was the result of arm's-length negotiations (reached only with the assistance of a neutral mediator), in which both sides were well-informed of the strengths and weaknesses of the other's position, it is clear that it was not the product of fraud or collusion, and this Court should not hesitate to approve it. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) (finding settlement was entitled to presumption of fairness when negotiated by informed counsel with the assistance of Professor Green); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of . . . a highly experienced mediator, lends further support to

the absence of collusion."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05–MD–1720 (JG)(JO), 2013 WL 6510737, at *9 (E.D.N.Y. Dec. 13, 2013) (finding the settlement negotiations were fair and conducted at arm's length when negotiations were assisted by Professor Green).

**B.    The Settlement Satisfies Each of the Relevant *Grinnell* Factors.**

In addition to being the result of arm's-length and informed negotiations free from fraud or collusion, the Settlement Agreement also satisfies each of the relevant *Grinnell* factors.

*1.    The Complexity, Expense and Likely Duration of the Litigation.*

In the absence of settlement, it is certain that the expense, duration, and complexity of the continued litigation would be substantial. "When comparing the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation, there are clearly strong arguments to be made for approving a settlement." *Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D. Mass. 2000).

While Plaintiff and Class Counsel ultimately believe in the merits of the claims, Class Counsel foresee numerous hurdles in the road to trial. Continued litigation would require the expenditure of significant time and money for additional discovery, the preparation of several expert witnesses, technical consultants, further motion practice on class certification as well as discovery and dispositive motions, costly trial preparation, and a technically complex and lengthy trial. (Richman Decl. ¶ 10.) Given the complexity of the issues, as well as the amount in controversy, the defeated party or parties would likely appeal any decision on summary judgment or verdict at trial. In comparison, the relief provided to the Settlement Class under the Agreement weighs heavily in favor of its approval compared to the inherent risks of continued litigation, trial, and appeal. *See In re Relafen Antitrust Litig.*, 231 F.R.D. at 72 (finding "the complexity, expense and likely duration of of the litigation . . . weighs heavily in favor of this

settlement."); *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005) ("[I]t has been held proper to take the bird in hand instead of a prospective flock in the bush.").

### 2. The Reaction of the Class to the Settlement.

The reaction of the Settlement Class to the settlement—which has been overwhelmingly positive—is analyzed by comparing the number of objectors and opt-outs with the number of claimants, and by assessing the extent to which notice effectively reached absent class members. *In re Lupron*, 228 F.R.D. at 96. Here, notice reached over 86% of the 358,000 Class Members directly, over 8,600 of whom have submitted claims. Only twelve individuals have chosen to exclude themselves from the Class, and just two have submitted comments on the settlement. (Morrison Decl. ¶ 17.) These numbers are similar to those in *Lupron*, where this Court found that 10,000 consumer claims, forty-nine opt-outs, and ten objections, out of a class of hundreds of thousands of purchasers generally supported approval of the settlement. *In re Lupron*, 228 F.R.D. at 96.

Further, the two comments, though styled "objections," present no reason not to approve the settlement here. First, though difficult to decipher, the substance of Michael Stanberry's "objection" focuses on a copyright infringement claim Mr. Stanberry purports to have against the Defendants and which he believes entitles him to $1 billion. (*See* Stanberry Letter, a copy of which is attached hereto as Exhibit 5.) Mr. Stanberry's letter does not identify any issue with or objection to the settlement.

The other objection is a self-described "public policy" objection by a retired attorney. (*See* Objection of Alan Trustman, a copy of which is attached hereto as Exhibit 6.) Mr. Trustman objects to the settlement because he believes that too few people object to class actions and that his personal experience with PC TuneUp has been superb. (*Id.*) Therefore, he purports not to believe the substance of Plaintiff's allegations nor that anyone should be compensated. (*Id.*)

Beyond that, Mr. Trustman does not identify any concerns with the structure or substance of the settlement in this case. In any event, these types of "philosophical" objections are inevitable in large class actions and should not be seen to "impugn the adequacy of the settlement itself." *See Domonoske v. Bank of Am., N.A.*, 790 F. Supp. 2d 466, 474 (W.D. Va. 2011) ("most of the 59 objections show a philosophical disagreement with class action litigation, a general disagreement with this litigation in particular, or dissatisfaction with class counsel's requested attorney's fees"); *see also e.g. In re Wachovia Equity Sec. Litig.*, No. 08-cv-6172, 2012 WL 2774969, at *4 (S.D.N.Y. June 12, 2012) ("The objections submitted . . . object generally to the lawsuit, claiming that it was frivolous. Their concerns seem to be aimed at the lawsuit itself, and whether [defendant] should have settled, rather than the fairness of the settlement to the class, and thus are properly taken up in another forum. They certainly do not undermine the Court's conclusion that the settlement is fair to the class.").

The fact that there are only these two comments to the settlement (neither of which addresses the actual terms of the settlement)—out of a Class of hundreds of thousands of individuals—demonstrates that Class Members find the settlement reasonable and fair, and strongly supports final approval. *See Giusti-Bravo v. U.S. Veterans Admin.*, 853 F. Supp. 34, 40 (D.P.R. 1993) ("Another indication of the fairness of a class action settlement is the lack of, or small number of, objections."); *see also Lipuma*, 406 F. Supp. 2d at 1324 ("a low percentage of objections points to the reasonableness of a proposed settlement and supports its approval."). Moreover, while notice of the settlement was sent to the U.S. Attorney General, and Attorneys General of all fifty states, the District of Columbia, and Puerto Rico, none have voiced any opposition to the terms of the Agreement. This lack of governmental opposition to the settlement likewise militates in favor of its approval. *See Fresco*, 2009 WL 9054828, at *5.

### 3. The Stage of Proceedings and the Amount of Discovery Completed.

The next *Grinnell* factor looks to the stage of proceedings at which settlement was achieved "to ensure that the plaintiffs have access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of the settlement against further litigation." *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1383 (S.D. Fla. 2007); *see also Rolland*, 191 F.R.D. at 10 ("the parties' discovery efforts have enabled the attorneys to assess the merits of the action and negotiate a principled compromise."). Even prior to filing suit, Class Counsel undertook a significant investigation, including expert analysis, into the operation of the PC TuneUp Software compared to its claimed capabilities. (Richman Decl. ¶ 3.) In addition, both formal and informal discovery showed (i) the total number of Settlement Class Members allegedly affected and (ii) the total amounts those Class Members paid for the Software. Finally, the Court's ruling on Defendants' motions to dismiss narrowed relevant issues and allowed Plaintiff to assess his likelihood of success compared to the risks of continued litigation. Although no oral discovery took place, a substantial amount of written discovery was completed (and a fair share of discovery disputes resolved) prior to the mediation. (*See* Richman Decl. ¶¶ 6–7.) Thus, by the time the Parties agreed to engage in formal mediation Plaintiff had enough information to sufficiently evaluate the strength of the claims of the Settlement Class and weigh the benefits of settlement against continued litigation. The stage of proceedings factor thus weighs in favor of approval. *See, e.g., In re M3 Power Razor Sys. Mktg. & Sale Practice Litig.*, 270 F.R.D. 45, 63 (D. Mass. 2010); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 67 (D. Mass. 1997).[11]

---

[11]     In fact, Courts "have often seen cases which were 'over discovered.' In addition to wasting the time of [the] Court, the parties and their attorneys, it often adds unnecessarily to the financial burden of litigation and may often serve as a vehicle to harass a party. Discovery in its

*(cont'd)*

#### 4.     *The Risks of Establishing Liability and Damages.*

Although Plaintiff and Class Counsel are confident in the strength of the claims at issue, as in every class action, there was a significant risk that this litigation would result in a lesser recovery for the Class, or no recovery at all. *See In re Lupron*, 228 F.R.D. at 97 ("As any experienced lawyer knows, a significant element of risk adheres to any litigation taken to binary adjudication."). In order to prevail on the claims remaining after the Court's ruling on the Motion to Dismiss (Dkt. 73), Plaintiff would be required to establish the accuracy of Defendants' alleged misrepresenations and performance of PC TuneUp, which would turn on complicated factual issues regarding the underlying source code, design and functionality of the Software. (*Id.*) Defendants vehemently denied Plaintiff's criticisms of the Software and promised to put up software engineers and expert witnesses at trial to counter the findings of Plaintiff's expert's investigation about its capabilities. Moreover, in addition to the increased risk presented by having to establish Plaintiff's claims under less-favorable Delaware as opposed to Massachusetts law, Defendant AVG CZ also asserted twenty-three affirmative defenses in its answer to the Amended Complaint, any one of which may have gained traction with the jury and defeated Plaintiff's claims. (*See* Dkt. 75.)

Establishing damages would present slightly less risk. Defendants' records show the amount paid by each Settlement Class Member for their PC TuneUp license, amounts that range from $29.99 to $34.99 during the class period. (Richman Decl. ¶ 11.) However, because PC TuneUp did perform some of its claimed functions, both sides would have engaged in another battle-of-the-experts regarding damages to account for the value of the Software as promoted compared to value of the Software as it actually operated. (*Id.*) These risks, particularly when

---

*(cont'd from previous page)*
most efficient utilization should be totally extra-judicial . . . Being an extra judicial process, informality in the discovery of information is desired." *Lipuma*, 406 F. Supp. 2d at 1324.

weighed against the value of the relief afforded the Settlement Class, further demonstrate the fairness and adequacy of the settlement.

### 5. *The Ability of Defendants to Withstand a Greater Judgment.*

The penultimate *Grinnell* factor examines the reasonableness of the settlement in light of Defendants' capacity to pay more. *See In re Lupron*, 228 F.R.D. at 97 (finding the factor to be neutral where defendant had "deep pockets"); *see also Wehlage v. Evergreen at Arvin LLC*, No. 10–cv–05839, 2012 WL 2568151, at *1 (N.D. Cal. June 25, 2012) ("the [c]ollectability of a judgment . . . bear[s] on the reasonableness of a settlement in relation to the defendants' ability to withstand a greater one") (internal quotations omitted) (brackets in original); *Aramburu v. Healthcare Fin. Servs., Inc.*, No. 02–cv–6535, 2009 WL 1086938, at *4 (E.D.N.Y. Apr. 22, 2009) ("[a] related consideration weighing in favor of settlement is defendant's dire financial condition, which makes obtaining a greater recovery than provided by the [s]ettlement . . . difficult") (internal quotations omitted). Here, while neither Defendant is a massive deep-pocketed corporation, AVG CZ is a profitable business likely to withstand a larger judgement, making this factor neutral as to it. Defendant Auslogics, however, is not as large a company nor as profitable, and payment of a judgment much larger than its share of the Settlement Fund would have resulted in serious financial problems. Accordingly, this factor further supports the reasonablenss of the settlement.

### 6. *The Amount of the Settlement Fund in Contrast to the Best Possible Recovery.*

The last *Grinnell* factor compares the value of the damages a Plaintiff could recover should he or she prevail (appropriately discounted for the risk of losing) with the value of what is offered by the proposed settlement. *In re Lupron*, 228 F.R.D. at 97 (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 805 (3d Cir. 1995)); *see also Protective Comm. for Indep. Stockholders v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to [analyzing a proposed settlement] in every instance, of course, is the need to compare the terms of the

compromise with the likely rewards of litigation."). That said, "[a] fine tuned equation by which to determine the reasonableness of the size of a settlement does not exist." *In re Relafen*, 231 F.R.D. at 73.

Here, a complete victory on the merits for Plaintiff and the Class would include (i) an award of damages for each of the more than 400,000 PC TuneUp Software licenses purchased by the Class and (ii) an injunction preventing the continued sale and promotion of the Software. The Parties' settlement, however, provides better benefits than what individual Class Members could have reasonably obtained by prevailing on the merits.

$15.00 (or more) Monetary Award. First, each Settlement Class Member that submits an Approved Claim will receive, at a minimum, a $15.00 check. However, the more likely result given the number of claims to date is that the settlement's redistribution process will be triggered and each claiming Class Member will receive a full refund of the amounts they paid for the Software (up to $35)—far exceeding what they could have recovered in damages had they prevailed on the merits at trial. Indeed, because Plaintiff has not alleged that the Software was worthless, only that the products had "diminished value," Class Members would likely receive only a portion of the full purchase paid if they were to prevail on the merits.[12]

4-Month Subscription to AVG AntiVirus. In addition to a monetary award, every Settlement Class Member will be entitled to a free, 4-month subscription to the latest version of AVG's AntiVirus software—a benefit that Class Members would not have received even had they been able to prevail on their claims at trial. Regardless of whether they have submitted a claim form, each Class Member will receive a link to activate a subscription to AVG AntiVirus. A one-year subscription to this consumer product—which is not at issue in this case—currently

---

[12]     In addition to the individual payments to Class Members, Defendants have agreed to pay from the Settlement Fund the costs of notice and administration of the settlement and reasonable attorneys' fee and incentive awards to Plaintiff Rottner and Class Counsel.

retails for $39.99, meaning that this component of the settlement represents approximately $13 in additional relief to each Settlement Class Member and more than $4.7 million for the Class as a whole. Further, Class Members will receive their free 4-month subscription with no obligation to provide personal information or credit card information, and the subscription will not automatically convert to a paid subscription at the end of the 4-month period.

Injunctive Relief. Next, Defendants have discontinued their sale of the Software at issue, thus achieving the best possible result in this respect and rendering an injunction unncessary.

Finally, the fact that there will be no reverter of any settlement funds to the Defendants is also indicative of the fairness of the settlement. Any monies remaining in the Settlement Fund after providing claimants full refunds will be paid to the proposed *cy pres* recipients discussed further in Section VII below, subject to the Court's approval. (Agreement § VI.A.4.). For all of these reasons, Rottner and proposed Class Counsel firmly believe the relief obtained for the Settlement Class, as well as the manner in which it was obtained, weighs heavily in favor of a finding that the settlement is fair, reasonable and adequate, and well within the range of approval. Accordingly, the Court can and should grant final approval.

## VII.    THE PROPOSED *CY PRES* RECIPIENTS SHOULD BE APPROVED.

Based on the number of claims submitted as of the date of filing this motion, it appears certain that those who filed valid claims will receive full refunds of the purchase price of PC TuneUp and the *cy pres* contingency included in the settlement will be implicated. The First Circuit endorses the distribution of unclaimed settlement funds to *cy pres* recipients. *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 38 (1st Cir. 2012) *cert. denied*, 133 S. Ct. 338 (2012) (approving *cy pres* distribution where $11.4 million remained of $40 million fund); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 33 (1st Cir. 2009) (approving *cy pres* distribution where $6.8 million remained of $24 million fund). *Cy pres* is appropriate where, as here, it is part

of a settlement negotiated at arm's length, is not court-mandated, facilitates the settlement of hard-fought complex litigation, benefits non-claimant class members, and especially where the settlement provides class members with a full recovery of their damages. *See In re Lupron Mktg.*, 677 F.3d at 30; *see also In re Pharm. Indus.*, 588 F.3d at 35 (citing Am. Law Inst., Principles of the Law of Aggregate Litigation ("ALI Principles") § 3.07 cmt. b (Apr. 1, 2009) (proposed final draft)).[13]

But *cy pres* funds cannot be directed to just any charitable group; they should be awarded to recipients whose interests "reasonably approximate" those pursued by the class. *In re Lupron Mktg.*, 677 F.3d at 33 (citing ALI Principles § 3.07(c) (approving *cy pres* distribution to organizations researching the treatment of cancer and other diseases where consumers had been overcharged for a related drug)); *see also In re Pharm.*, 588 F.3d at 30 (approving *cy pres* distributions to "mutually acceptable charitable organizations funding cancer research or patient care" where consumers had overpaid for related drugs). In determining whether the recipients' interests "reasonably approximate" those of the class, courts assess the following non-exclusive list of factors:

> [1] the purposes of the underlying statutes claimed to have been violated, [2] the nature of the injury to the class members, [3] the characteristics and interests of the class members, [4] the geographical scope of the class, [5] the reasons why the settlement funds have gone unclaimed, and [6] the closeness of the fit between the class and the cy pres recipient.

*Id.*

Here, the interests of the proposed *cy pres* recipients are neatly aligned with the interests of the Class Members allegedly damaged by Defendants' conduct. Both proposed recipients—

---

13      Similarly, the First Circuit has rejected the distribution of residual funds to claimants who have already fully recovered their losses. *In re Lupron Mktg.*, 677 F.3d at 35. The First Circuit has also rejected the notion that unclaimed funds should be returned to a defendant, noting that such a policy would "undermine the deterrence function of class actions . . . by rewarding the alleged wrongdoer simply because distribution to the class would not be viable." *Id.* at 33 (quoting ALI Principles § 3.07 cmt. b) (internal quotations omitted).

the National Consumer Law Center ("NCLC") and the Stanford Security Laboratory—are well established organizations aimed at addressing consumer fraud and technology issues on a national scale. They are therefore capable of addressing the nationwide scope of the Class and its alleged injuries.

The NCLC has dedicated itself to consumer justice issues since its founding in 1969 and has taken a leadership role in the development of laws aimed at protecting consumers, such as the Credit CARD Act of 2009. The NCLC also works closely with nonprofit organizations, legal service organizations, attorneys, policymakers, and state and federal governments to stop exploitive consumer practices, help consumers build and retain wealth, and advance economic fairness. The NCLC's expertise has focused on a broad range of consumer issues, including deceptive acts and practices, and privacy rights.

For its part, the Stanford Security Lab also shares the interests of the Class. Part of the Computer Science Department at Stanford University, the Security Lab takes part in educational and research projects that focus on various aspects of network and computer security. Its Web Security project aims to protect consumers against online threats, while other projects focus on protecting sensitive information on the Internet. By furthering academic research, the work of the Security Lab promises to benefit online consumers as technology continues to evolve.

Given their dedication to consumer advocacy and the technological issues defining the online consumer landscape, the interests of the proposed *cy pres* recipients "reasonably approximate" the interests of the Class. Accordingly, the Court should approve the NCLC and the Stanford Security Lab as the *cy pres* recipients.

## VIII.   THE REQUESTED ATTORNEYS' FEES AND EXPENSES ARE REASONABLE.

Next, Class Counsel's request for an award of attorneys' fees in the amount of

$750,000—reduced from the agreed-upon one-third of the Settlement Fund[14]—is reasonable and

warrants the Court's approval as well. Although negotiated fee awards are strongly encouraged,

the Court ultimately has discretion over the amount to be awarded. *See Hensley v. Eckerhart*, 461

U.S. 424, 437 (1983) ("A request for attorneys' fees should not result in a second major litigation.

Ideally, of course, litigants will settle the amount of the fee."). Likewise, in the First Circuit,

courts have discretion to calculate attorneys' fees in common fund cases such as this on either a

percentage of the fund ("POF") or lodestar basis. *See In re Thirteen Appeals Arising out of San

Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995).

Ultimately, the POF approach is "the prevailing praxis." *Id*. Indeed, as this Court has

noted, "[c]ourts have long recognized that a lawyer who recovers a 'common fund' for the class

she represents is entitled to be paid a reasonable attorneys' fee and her expenses prior to the

distribution of the balance to the class." *In re Lupron Mktg. & Sales Pracs. Litig.*, No. 01-cv-

10861, 2005 WL 2006833, at *2 (D. Mass. Aug. 17, 2005); *see also Garcia-Rubiera v. Fortuno*,

727 F.3d 102, 116 (1st Cir. 2013) (acknowledging that percentage-of-the-fund approach applies

where "attorneys seek compensation from a discernable pot of money won by the plaintiffs").[15]

---

[14]      The requested $750,000 fee award represents 30% of the $2.5 million cash Settlement
Fund, and less than 11.6% of the total settlement value (when accounting for the in-kind relief to
the Settlement Class as a whole).

[15]      Because Class Counsel seek attorneys' fees from the Settlement Fund, not from
Defendants, this Court's inherent equitable powers over the fund under the common fund
doctrine are invoked, not the law of any particular state. *See Sprague v. Ticonic Nat'l Bank*, 307
U.S. 161, 164 (1939) (holding that authority to award fees from a common fund stems from "the
historic equity jurisdiction of federal courts"); *cf. In re Volkswagen & Audi Warranty Extension
Litig.*, 692 F.3d 4, 16-17 (1st Cir. 2012) (applying state law principles where agreement provided
that attorneys' fees would be paid by defendant on top of class-wide benefits, noting that "[t]he
common fund method should apply only where attorneys seek compensation from a discernable
pot of money won by the plaintiffs."); *Brenner v. J.C. Penney Co.*, No. 13-cv-11212, 2013 WL

*(cont'd)*

The POF approach also offers several distinct advantages, including that "it is less burdensome to administer, it reduces the possibility of collateral disputes, it enhances efficiency throughout the litigation, it is less taxing on judicial resources, and it better approximates the workings of the marketplace." *Id*.

In any event, regardless of the method the Court chooses to apply, Class Counsel's requested attorneys' fees are more than reasonable and should be approved.

**A.      The Requested Attorneys' Fee Award is Reasonable Under the POF Method.**

While the First Circuit does not mandate weighing any particular set of factors in assessing a fee request under the POF approach, seven factors are typically considered, including:

> (1) the size of the fund and the number of persons benefitted; (2) the skill, experience, and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the risks of the litigation; (5) the amount of time devoted to the case by counsel; (6) awards in similar cases; and (7) public policy considerations.

*In re Lupron*, 2005 WL 2006833, at *3. Here, each of those factors demonstrates that the requested fee award—which, again, amounts to less than the 33% agreed-upon by the Parties, less than 11.6% of the total settlement value (including the in-kind relief) and equal to 30% of the $2.5 million cash Settlement Fund—is reasonable.

### *1.      Size of the Fund and Number of Persons Benefitted.*

First, the $2.5 million cash Settlement Fund (which does not include the value of the in-kind relief to which every Class Member is also entitled) will be paid out for the benefit of the entire Settlement Class, with nothing returned to Defendants. Subject to Court-approval, any

---

*(cont'd from previous page)*

6865667, at *2 n.6 (D. Mass. Dec. 26, 2013) (applying state law where agreement stated that attorneys' fees were "to be paid by [defendant]," noting that "[a]s *Volkswagen* makes clear, a settlement is not a 'common fund,' at least for attorneys' fee award purposes, when class counsel will receive fees separate from the settlement proceeds.")*; see also Trombley v. Bank of Am. Corp.*, No. 08-CV-456-JD, 2013 WL 5153503, at *8–9 (D.R.I. Sept. 12, 2013) (approving fees amounting to 30% of $1,200,000 fund under federal percentage analysis).

monies that remain in the Settlement Fund following payment of all Valid Claims, the costs of notice and administration, and reasonable attorneys' fees and incentive awards, will be paid to the NCLC and the Stanford Security Lab, whose work advances the interests of the non-claimant Class Members.

While the entire $2.5 million Settlement Fund will be exhausted for the ultimate benefit of the Class as whole, this factor next requires the Court to determine whether the requested attorneys' fees will "dilute" the recovery to those individual Class Members who actually make claims against the Fund. *See In re Lupron*, 2005 WL 2006833 at *3 ("It is apparent from the now fixed number of claims submitted that a fee award in the 25 or even 30 percent range will not dilute the recovery to [plaintiffs.]"). That is not an issue here either. Even assuming each of the more than 8,600 Class Members who have submitted claims to date receive $35 for each license of the Software they purchased,[16] there will still be money remaining in the Fund[17] and thus, the requested attorneys' fees here will not dilute any Class Members' claims against the Fund.[18]

As such, this factor weighs in favor of approving the requested fee award.

### 2. *Skill, Experience, and Efficiency of Counsel.*

The skill, experience, and efficiency of Class Counsel also weigh in favor of approving the requested attorneys' fees here. Class Counsel are well respected and recognized leaders of

---

[16]     To be clear, some Settlement Class Members paid lesser amounts for their licenses to the Software and therefore, even with the redistribution of the Settlement Fund as contemplated by the Parties' Agreement, would be entitled to an amount up to the full purchase price they actually paid, not $35. (Agreement § VI.A.2.)

[17]     That is, after payment of the requested attorneys' fees ($750,000), notice and administration expenses (approximately $83,000), and the requested incentive award ($1,500), there will be more than $1.6 million remaining in the Fund.

[18]     Indeed, each Class Member who has submitted an Approved Claim *will be more than made whole*, receiving a full refund as well as the available in-kind relief. Non-claimant Settlement Class Members will also be benefited, both by the work conducted by the proposed *cy pres* recipients and in the form of access to the free AntiVirus software they will receive. Because claiming and non-claiming Class Members alike will benefit from the settlement, this factor weighs in favor of approving the requested attorneys' fees.

the plaintiffs' class action bar, particularly in cases at the intersection of technology and consumer protection. Various courts and arbitrators have described class counsel as being "vigorous advocates [and] constructive problem solvers," "pioneer[ing]" technology class actions, and achieving "unique success … in the area of technology consumer protection class actions." Their experience includes prosecuting numerous class actions against various defendants who, like here, are accused of deceptively designing and marketing so-called "utility software" products. (*See* Richman Decl. ¶ 14)

Class Counsel used this skill and experience to efficiently achieve a favorable result for the Class by diligently investigating consumer complaints through in-depth analysis and expert investigation of the Software, vigorously pursuing Plaintiff's claims (even in the face of complex international procedural hurdles), and repeatedly negotiating with highly respected defense counsel who vigorously defended their clients' positions. This factor thus weighs in favor of approving the requested fees here. *See In re Lupron*, 2005 WL 2006833, at *4 (awarding requested fees where class counsel were "honorable litigators devoted to the interests of their clients who vigorously contested the case from its inception" and were "among the most experienced lawyers the national bar has to offer in the prosecution and defense of significant class actions") (internal quotations omitted).

### 3. *Complexity and Duration of Litigation.*

The next factor—the complexity and duration of litigation—also weighs in favor of approving the requested fees. First, this litigation involves the complex analysis of exactly how Defendants' Software operates. Prior to filing the initial complaint, Class Counsel investigated— with both the assistance of a computer forensic expert and their own specialized expertise— consumer complaints regarding PC TuneUp and whether it lived up to Defendants' claims of being able to identify and repair a wide range of PC system errors and threats and to, *inter alia*,

boost computer speed. Through this analysis of the Software, as well as the review of Defendants' extensive document production, Class Counsel fully investigated the operation of the Software's purported diagnostic and repair features—both for their own edification and in preparation for having to ultimately explain the exact functionality of the Software to lay triers-of-fact.

In addition to the factual complexity of the case, the litigation was complicated by the presence of various international defendants. The original defendant, AVG US, pointed the finger at a European affiliate and an Australian entity. Serving the Australian entity turned out to be a significant undertaking involving unsuccessful attempts by both Australian authorities and a private international process server to attempt service, and ultimately requiring a motion before this Court deeming service effectuated.

Finally, throughout the more than eighteen months of litigation, Defendants have vigorously disputed both Plaintiff's factual allegations and legal positions, requiring substantial motion practice involving choice-of-law, forum selection, and other legal issues.

Accordingly, the complexity and duration of litigation factor weighs in favor of approving the requested attorneys' fees as well. *See, e.g., In re Lupron*, 2005 WL 2006833, at *4 (approving requested fees where case involved "thorny issues of fact" and "ha[d] been vigorously contested from its inception"); *cf. Mann & Co., PC v. C-Tech Indus., Inc.*, No. 08-cv-11312, 2010 WL 457572, at *1 (D. Mass. Feb. 5, 2010) (reducing requested attorneys' fee where case "did not raise complex … issues" and "was not fiercely litigated").

### 4. *Risks of Litigation.*

The next factor to consider in evaluating a requested fee award—the risks of litigation—focuses on the risk that Class Counsel would not get paid at all due to the contingent nature of the representation. As this Court has noted, "[m]any cases recognize that the risk assumed by an

attorney is perhaps the foremost factor in determining an appropriate fee award." *In re Lupron*, 2005 WL 2006833, at *4 (internal quotations omitted). Here, the risk that Class Counsel would receive no fee at all was substantial because of the possibility that this complex, technology-oriented class action would not ultimately be successful.

While Class Counsel believe that they are correct on the merits, success at trial is far from guaranteed. Defendants vigorously disputed Plaintiff's factual allegations regarding the functionality of PC TuneUp and asserted that the Software's privacy protections, disk speed optimization (including disk and windows registry defragmentation), and error-detection functions, among other things, performed as advertised. Each of these disputed factual questions would also require complex expert testimony at trial. For better or worse, such "battles of the experts" often turn on intangibles such as the experts' demeanor and tone, *see, e.g., Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741, 745 & n.8 (11th Cir. 1986), rendering Plaintiff's ultimate likelihood of success at trial far from certain. In addition, Defendants have stated that their respective insurers have denied an obligation to provide coverage for their conduct, further increasing the risk to Class Counsel of non-payment.

In short, Class Counsel bore a substantial risk that they might never be compensated at all for their efforts on behalf of the Class in this litigation. Bearing this risk weighs strongly in favor of approving the requested fees.

### 5. *Amount of Time Devoted to the Case by Class Counsel.*

The next factor to consider is the amount of time Class Counsel have devoted to the case. The tension between time expended and efficiency should be kept in mind when considering this factor. As one oft-cited commentator has noted:

> "[H]ours of time expended" is a nebulous, highly variable standard, of limited significance. One thousand plodding hours may be far less productive than one imaginative, brilliant hour. A surgeon who skillfully performs an appendectomy in seven minutes is entitled to no smaller fee than one who takes an hour; many a

patient would think he is entitled to more…. [W]hen hours become a criterion, economy of time may cease to be a virtue. Inexperience, inefficiency, even incompetence will be rewarded. Expeditious termination of litigation will be discouraged—to the great cost of all concerned, including the state.

George B. Hornstein, *Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards*, 69 Harv. L. Rev. 658, 660-61 (1956). Here, Class Counsel spent 1,400 hours over nearly two years investigating, litigating, and settling this lawsuit. While this is a significant amount of time, because of Class Counsel's specialized experience in both consumer technology cases generally, and fraudulent software cases specifically, they were able to obtain an exceedingly beneficial resolution of this complex matter efficiently. These long hours coupled with their expertise weigh in favor of approval of the requested fee award.

### 6. *Awards in Similar Cases.*

The next factor to consider in determining the appropriateness of a fee request is awards in similar cases. This factor likewise supports the requested fee amount here.

As this Court has noted, "[c]ourts in the First Circuit have recognized that fee awards in common fund cases typically range from 20 to 30 percent." *In re Lupron*, 2005 WL 2006833, at *5.[19] The $750,000 requested fee award here equals 30% of the $2.5 million Settlement Fund, and thus falls within the range of similar awards. While admittedly at the high end, such an award is justified because of the superlative results achieved for the Class here. As explained above, every Class Member who has submitted a claim against the fund is going to be *more than made whole*. Specifically, every claimant will receive a *full refund* of the disputed Software's purchase price. *In addition*, every Class Member is entitled to at least four months of free access to AVG's AntiVirus software, which retails for $39.99 per year. Finally, the Settlement Fund is

---

[19]    This range may actually understate the amount of attorneys' fees that are typically awarded in class action cases. *See* Alba Conte & Herbert Newberg, Newberg on Class Actions § 14:6 (4th ed.) ("Empirical studies show that, regardless of whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery.").

non-reversionary, and any leftover funds will be paid out to the above-referenced *cy pres* recipients (subject to Court approval) whose work benefits the entire Settlement Class.

Additionally, the requested fee amount represents less than 11.6% of the total settlement value when the available in-kind relief is considered. *See generally, Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 522 n.6 (1st Cir. 1991) (noting that the common fund doctrine can apply in cases where class members receive a common benefit other than cash). Because courts generally consider the requested fee in light of the total benefit *available* to the class, rather than the total benefit redeemed by the class, the value of the in-kind relief would be over $4.7 million for the 358,000 Class Members (with the total settlement value thus over $7.2 million); *see also Boeing Co. v. Van Gemert*, 444 U.S. 472, 479-81 (1980) (affirming fee award based on percentage of the amount available to class, noting that "[absentee class members'] right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit … created by the efforts of class representatives and their counsel.").

Whether looking at the value of both the Settlement Fund and the in-kind relief, or solely the value of the Settlement Fund, the requested attorneys' fees fall within the range of fees awarded in other class actions in this Circuit. In light of the exceptional results obtained here, where each claimant will be made more than whole, this factor supports approving the requested amount of attorneys' fees as well.

### 7.      *Public Policy Considerations.*

Finally, public policy considerations also weigh in favor of approving the requested fee amount here. In light of the high costs of litigation relative to the small damages to any individual victim of consumer fraud, there is a significant societal interest in encouraging knowledgeable and experienced counsel to undertake the complex technological investigation and litigation necessary to obtain redress for software consumers. *See, e.g., In re Lupron*, 2005

WL 2006833, at *6 (finding public policy supported requested fee award, noting that "there is a significant societal interest in obtaining redress for … consumers whose harms could not, given the cost of litigation, be pursued on an individual basis."). Awarding the requested attorneys' fees here furthers that interest, and this factor consequently weighs in favor of approving the request.

## B. The Requested Attorneys' Fee Award is also Reasonable Under the Lodestar Approach.

Class Counsel's requested attorneys' fees are equally reasonable under the lodestar method—whether used as validation of the appropriateness of the amount requested under the POF approach or as the primary method of calculation. *In re Lupron*, 2005 WL 2006833, at *6. To determine the base lodestar amount, courts multiply the number of hours that counsel reasonably expended on the litigation by an hourly rate that takes into consideration the experience of the lawyers and their geographic location. *See In re Thirteen Appeals*, 56 F.3d at 305. Under the typical lodestar approach, the resulting base lodestar may then be enhanced by application of a reasonable risk-multiplier to account for the contingent nature of the action and/or other factors. *See, e.g., In re TJX Cos. Retail Sales Sec. Breach Litig.*, 584 F. Supp. 2d 395, 398 (D. Mass. 2008).

As reflected by the chart below, Class Counsel's base lodestar to date is $616,703.00. (Richman Decl. ¶ 19; Declaration of David Pastor ("Pastor Decl.") ¶ 9, attached as Exhibit 7.)[20]

---

[20]     Class Counsel and their co-counsel in this matter have also incurred $17,804.28 in reimbursable expenses (including filing and appearance fees, and case administration expenses), but are not seeking to recover that amount separate from their fee request. (Richman Decl. ¶ 18; Pastor Decl. ¶ 10.)

| ATTORNEY | EXPERIENCE (YRS) | HOURLY RATE | HOURS | TOTAL |
|---|---|---|---|---|
| Jay Edelson (Partner) | 18 | $685.00 | 89.2 | $61,102.00 |
| Rafey S. Balabanian (Partner) | 9 | $570.00 | 290.5 | $165,585.00 |
| Benjamin H. Richman (Partner) | 5 | $450.00 | 475.4 | $213,930.00 |
| Chandler R. Givens (Associate) | 3 | $350.00 | 231.9 | $81,165.00 |
| David Mindell (Associate) | 2 | $335.00 | 166.7 | $55,844.50 |
| Various Law Clerks | n/a | $215.00 | 137.1 | $29,476.50 |
| David Pastor (Principal, Pastor Law) | 34 | $600.00 | 16.0 | $9,600.00 |
| | | TOTAL | 1,406.8 | $616,703.00 |

The attorney and staff rates used to calculate Class Counsel's base lodestar (depicted in the table above) are comparable to those charged by attorneys with equivalent experience, skill, and reputation for similar services in the Boston and Chicago legal markets, as well as other comparable markets throughout the country, and they have previously been approved by courts in this District, this Circuit, and nationwide. (Richman Decl. ¶ 20; Pastor Decl. ¶ 9.) Additionally, the hourly rates used to calculate Class Counsel's lodestar are the same as those charged to Class Counsel's hourly-paying clients, which supports a finding that their fee request is reasonable. (Richman Decl. ¶¶ 20-21.) As such, there should be no question that Counsel's base lodestar is both fair and reasonable.

The lodestar calculation, however, does not end with this base amount. Instead, the base lodestar is often enhanced with a reasonable risk-multiplier. Courts in the First Circuit have typically found multipliers in the range of 1.97 to 2.697, which is consistent with the multipliers applied in similar class actions throughout the country. *See, e.g., In re TJX Cos.*, 584 F. Supp. 2d at 408 (finding multiplier of 1.97 reasonable); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 82 (D. Mass. 2005) (finding multiplier of 2.02 appropriate); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 271 (D.N.H. 2007) (finding multiplier of 2.697 appropriate); Conte & Newberg, Newberg on Class Actions § 14:6 ("Multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied."). In this case, a multiplier of only 1.21 need be applied to Class Counsel's base lodestar in order to yield the requested $750,000 fee award. Such a multiplier has not only been found to be reasonable in similar cases, but is

particularly reasonable (and warranted) here given the exceptional results Class Counsel was able to obtain on behalf of the Settlement Class. *See id.*; *see also supra* Section VII.A.

As such, Class Counsel's requested fee award is undeniably reasonable in this regard as well.

## IX. THE COURT SHOULD APPROVE THE AGREED-UPON INCENTIVE AWARD.

Finally, the negotiated incentive award of $1,500 to Plaintiff Rottner as Class Representative should be approved as well. Courts routinely approve incentive awards to compensate named plaintiffs for the services they provide during the course of class action litigation. *In re Lupron*, 2005 WL 2006833, at *7. Further, in granting incentive awards, "courts consider not only the efforts of the plaintiffs in pursuing the claims, but also the important public policy of fostering enforcement of laws and rewarding representative plaintiffs for being instrumental in obtaining recoveries for persons other than themselves." *Bussie v. Allamerica Fin. Corp.*, No. 97-cv-40204, 1999 WL 342042, at *3-4 (D. Mass. May 19, 1999) (approving $5,000 incentive awards to named plaintiffs); *see also In re Lupron*, 2005 WL 2006833, at *7 ("Because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit.") (internal quotation omitted).

Here, without any expectation that he might recover such an award, or anything at all, Plaintiff Rottner devoted his own time and effort to pursuing claims on behalf of the Class, and otherwise exhibited a willingness to participate in and undertake the responsibilities and risks attendant with bringing such an action. (Richman Decl. ¶ 25.) At all times, he willingly assisted Class Counsel with the investigation of his claims and provided them with valuable information regarding his purchase, use, and experiences with the Software. (*Id.* ¶ 26.) He also consulted with Class Counsel on multiple occasions over the phone and by email, and reviewed numerous pages of documents, including filings and settlement papers, among others. (*Id.* ¶ 27.) His extensive

40

involvement was ultimately instrumental in reaching a settlement with Defendants and obtaining the relief now available to the Settlement Class. (*Id.* ¶ 28.) As such, the agreed-upon incentive award of $1,500 is reasonable to compensate him for his efforts and encourage others do to the same in future cases.[21]

## X.    CONCLUSION

For the foregoing reasons, Plaintiff Christopher Rottner respectfully requests that the Court enter an Order (i) confirming certification of the Settlement Class, the appointment of Class Counsel, and the appointment of the Class Representative, (ii) granting final approval of the Parties' class action settlement, (iii) approving the proposed *cy pres* recipients, (iv) approving the requested attorneys' fees and incentive award, and (v) providing such other and further relief as the Court deems reasonable and just.

Respectfully submitted,

**CHRISTOPHER ROTTNER**, individually and on behalf of all others similarly situated,

Dated: April 3, 2014                    By:  /s/ Benjamin H. Richman
                                             One of Plaintiff's Attorneys

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Benjamin H. Richman (Admitted *Pro Hac Vice*)
brichman@edelson.com
Chandler R. Givens (Admitted *Pro Hac Vice*)
cgivens@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

---

[21]    Notably, this request is lower than others approved for class representatives who did comparable work during the course of similar class litigaiton. *See, e.g., In re Lupron*, 2005 WL 2006833 at *7 (granting $2,500 incentive award to named consumer plaintiffs).

David Pastor (BBO# 391000)
dpastor@pastorlawoffice.com
PASTOR LAW OFFICE, LLP
63 Atlantic Avenue, Third Floor
Boston, Massachusetts 02110
Tel: 617.742.9700
Fax: 617.742.9701


## CERTIFICATE OF SERVICE

I, Benjamin H. Richman, an attorney, hereby certify that on April 3, 2014 I served the above and foregoing *Plaintiff's Motion and Memorandum of Law in Support of Final Approval of Class Action Settlement and Award of Attorneys' Fees and Incentive Award*, by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system, on this the 3rd day of April 2014.

/s/ Benjamin H. Richman